**Ollie McCLUNG, Sr. and Ollie McClung, Jr., Plaintiffs,**

**v.**

**Nicholas deB. KATZENBACH, as Acting Attorney General of the United States of America, et al., Defendants.**

**Civ. A. No. 64-448.**

United States District Court
N. D. Alabama, S. D.

Sept. 17, 1964.

Probable Jurisdiction Noted
Oct. 5, 1964.

See 85 S.Ct. 11.

Robert McD. Smith, William G. Somerville, Jr., and James H. Faulkner, of Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for plaintiffs.

K. William O'Connor, Department of Justice, Washington, D. C., for defendants.

Before GEWIN, Circuit Judge, and LYNNE and GROOMS, District Judges.

## PER CURIAM.

This is a suit by the owners and operators of a restaurant business in Birmingham, Alabama, seeking to enjoin the enforcement of the provisions of title II of the Civil Rights Act of 1964[1] on the ground that they are unconstitutional. A statutory three-judge court was convened pursuant to 28 U.S.C.A. § 2282, and the case was set down for hearing on September 1, 1964, on plaintiffs' prayer for a temporary injunction. Prior to the hearing the defendants moved to dismiss the complaint on the separate grounds that (1) the court lacks jurisdiction over defendant Robert F. Kennedy[2] as Attorney General of the United States, because of insufficient service of process; (2) since defendant Robert F. Kennedy is an indispensable party, the insufficiency of service of process upon him renders co-defendant Macon L. Weaver, United States Attorney for the Northern District of Alabama, an improper party defendant;

(3) the complaint fails to state a claim upon which relief can be granted; and, (4) the court lacks equitable jurisdiction because plaintiffs have an adequate remedy at law. This motion was heard by and submitted to the full court on briefs and oral argument of counsel on September 1, 1964, and was taken along with plaintiffs' prayer for a temporary injunction.

### THE MOTION TO DISMISS

The first two grounds for dismissal, both based upon the theory that service of process upon the Attorney General was defective, are no longer in issue. Service of process upon the Attorney General was made initially by certified mail in accordance with the provisions of 28 U.S.C.A. § 1391(e), and defendants contended that because fictitious parties were joined as defendants the provisions of section 1391(e) were inapplicable. Thereafter, plaintiffs amended their complaint by striking and dismissing therefrom the unserved fictitious parties and caused the complaint as amended to be re-served upon the Attorney General under section 1391(e). It was conceded by counsel for defendants on argument that the first two grounds in their motion to dismiss were thereby eliminated and accordingly are considered abandoned.

Defendants have also insisted in their brief and oral argument that the complaint does not present an actual controversy between the parties and that the adequacy of legal remedies deprives this court of equitable jurisdiction. These grounds were argued in the hearing on plaintiffs' prayer for temporary injunction at which evidence was adduced developing the undisputed facts set out below.[3]

Contending that there has not been a sufficient showing of a specific threat of

---

1. Public Law 88–352; 78 Stat. 241.

2. Since Robert F. Kennedy tendered his resignation as Attorney General of the United States, which was accepted after submission of this case to the court and since Nicholas deB. Katzenbach has been appointed Acting Attorney General of the

United States, the said Katzenbach is hereby substituted, in his official capacity, for the said Kennedy as a party defendant, as provided by Rule 25(d) (1) Fed. R.Civ.P.

3. 1. Plaintiffs are partners operating a restaurant under the trade style "Ollie's

immediate enforcement of title II of the act as to the plaintiffs, defendants insist alternatively that it is not alleged that defendants either have instituted enforcement proceedings against the plaintiffs or have conducted an investigation to determine whether plaintiffs have violated the act, and that insufficient facts are alleged to bring the plaintiffs within the coverage of the act.

In urging that the allegations are insufficient to show coverage, defendants point first to averments in the complaint respecting the remoteness of plaintiffs' business from any place normally frequented by interstate travelers, the absence of any advertising by them and the averment that to their knowledge they

serve no "interstate travelers" as that term is used in the act. It is true that these allegations, substantiated by evidence at the hearing, tend strongly to indicate an absence of coverage under title II insofar as it relates to a restaurant which "serves or offers to serve interstate travelers", and defendants have made no contention that they are covered by virtue of that part of the act.

■ Defendants then seize upon the averment that "some" of the food served in plaintiffs' restaurant originated in some form outside of Alabama. This use of the word "some", say defendants, is insufficient because the act uses the term "substantial" in defining the portion of a restaurant's food which must move in

---

Barbecue" at 902 Seventh Avenue South, in Birmingham.

2. The plaintiffs' family has operated such restaurant under the same name and at the same location since 1927.

3. Plaintiffs' restaurant specializes in barbecued meats and homemade pies; approximately 90 to 95 per cent of its sales consist of such items and nonalcoholic beverages.

4. Plaintiffs' restaurant, when filled to capacity, will seat approximately 220 persons; its trade is derived from local regular customers who are for the most part known to the plaintiffs; its trade is predominantly composed of white collar business people and family groups. Plaintiffs feature in their restaurant a wholesome atmosphere in which no profanity or consumption of alcoholic beverages is allowed. The restaurant is closed on Sunday. Plaintiffs have in the past declined service to persons who have been profane and have given the appearance of drinking alcoholic beverages.

5. Plaintiffs' restaurant is located in an area of Birmingham in which are located primarily residences occupied by Negroes and light industrial development; in the nearby vicinity are several Negro churches and schools attended by Negro children.

6. The restaurant is eleven blocks from the nearest interstate highway, a somewhat greater distance from the nearest railroad station and bus station and between six and eight miles from the nearest airport.

7. Plaintiffs seek no transient trade and do no advertising of any kind except for the maintenance of a sign on their own premises. To their knowledge plaintiffs serve no interstate travelers.

8. In the twelve months preceding the passage of the Civil Rights Act of 1964, plaintiffs purchased approximately $150,000 worth of food, all locally. Approximately 55 per cent of this was for meat and between 80 and 90 per cent of the meat purchases were from George A. Hormel & Company, at its Birmingham branch. Its purchases from Hormel for that period were shown to be $69,783. All of the meat purchased from Hormel was shipped to its Birmingham branch from outside the State of Alabama.

9. Plaintiffs employ 36 persons at their restaurant, approximately two-thirds of whom are Negro. Plaintiffs personally prepare food and serve customers. Plaintiffs and some of their employees would not voluntarily serve meals to Negroes.

10. Since July 2, 1964, plaintiffs have not complied with the Civil Rights Act of 1964; they have, in fact, on more than one occasion, refused service to Negroes on an equal basis with white customers and on such occasions plaintiffs have been in actual violation of the act.

11. Because of their location and the manner of conducting their business, plaintiffs would lose a substantial amount of business if forced to serve Negroes in their restaurant. From its beginning, plaintiffs' restaurant has served only white trade.

12. A substantial portion of the food served in plaintiffs' restaurant has moved in commerce and plaintiffs have, since July 2, been in violation of the Civil Rights Act of 1964.

commerce in order that it be within the alternative criterion of coverage prescribed by section 201(c) (2). We are of the opinion that the meaning of the term "substantial" as there used must and can only be determined judicially, and we conclude as a matter of law, on the basis of objective evidence, that a "substantial" portion of the food served by plaintiffs has moved in commerce within the meaning of the act.

 As defendants note, the complaint avers neither that enforcement proceedings have been instituted against plaintiffs nor that their restaurant was investigated by defendants prior to the commencement of the action. Plaintiffs do aver that prior to its filing they had violated the provisions of title II applicable to their restaurant by refusing to provide service to Negroes on the same basis as they provide to their other customers, and the evidence shows that since its commencement they have consistently continued and will continue thus to violate the act. In this respect alone the circumstances of this case are quite different from those existing in the cases urged by defendants in support of their position that this suit presents no justiciable controversy.

One of the plaintiffs testified further that he was caused in large part to institute this action by the fact that the defendants two days previously had filed in this court an enforcement suit against other persons operating restaurants of a similar character, and it appears from the complaint in that suit [4] that the act's coverage was invoked in part upon the basis that a substantial part of their food had moved in commerce. And plainly the Attorney General has indicated an intention to enforce the provisions of title II as against its violators. We cannot say, in these circumstances, that enforcement against plaintiffs was not reasonably imminent when this action was commenced, and no case cited by defendants or found by us has held under comparable circumstances that for this reason an actual controversy did not exist.

There are, moreover, many instances in which a threat of imminent enforcement of a law has not been considered requisite to the existence of a justiciable controversy or the exercise by federal courts of equitable jurisdiction in similar suits seeking anticipatory relief from the operation and enforcement of the law.

In their complaint plaintiffs attack the validity of title II of the act in its entirety. The act requires in positive terms that the plaintiffs, in the operation of their restaurant, afford to all persons "the full and equal enjoyment of the goods, services [and] facilities." Consequently, as to the plaintiffs, title II creates a mandatory duty to which it commands immediate obedience. As against this, the plaintiffs contend, and it is the object of this suit to determine, that they have a constitutional right to operate their business free of the restrictions now imposed upon it by the act. They aver, and have shown by evidence, that these requirements of title II will cause substantial and irreparable injury to their business. Thus, the substance of the allegations and proof is that the provisions of title II and the duty it imposes constitute a present injurious impingement upon the plaintiffs' property rights. The existence of a justiciable controversy as well as the equitable jurisdiction of the federal courts and the right to injunctive relief have been upheld often under similar circumstances. Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Commonwealth of Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); Public Utilities Comm'n of State of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952); Pierce v. Society of Sisters, 268 U.S. 510, 45

4. Civil Action No. 64–443, Northern District of Alabama.

S.Ct. 571, 69 L.Ed. 1070 (1925); Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939); Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). It is our considered opinion that these decisions are controlling upon the present case and that defendants' motion to dismiss the complaint therefore should be overruled.

## THE MERITS

Having negotiated the procedural hurdles, we proceed to an examination of title II of the Civil Rights Act of 1964:

"Sec. 201. (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title *if its operations affect commerce*, or if discrimination or segregation by it is supported by State action: * * *

* * * * * *

"(2) *any restaurant*, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

* * * * * *

"(c) *The operations of an establishment affect commerce within the meaning of this title if* * * * (2) *in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers or a substantial portion of the food which it serves*, or gasoline or other products which it sells, *has moved in commerce * * *.*" (Emphasis supplied.)

Contending that the foregoing portions of the act, as applied to the local business which they operate, are unconstitutional, plaintiffs insist that when private establishments within the confines of the respective states, in the lawful and legitimate exercise of their private discretion, wish to select their customers there is no power, under the Constitution, or any of its amendments, granted to the federal government to regulate such private accommodations.

The heart of the federal compact beats in the tenth amendment of the Constitution: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Thus it is to the Constitution and its amendments that we must look to determine whether Congress possesses the power it has in this instance sought to exercise.

Insofar as we can determine from a review of the legislative history of the act [5] and the extensive debates in the Senate relevant to title II,[6] the only three suggested sources of congressional power were the thirteenth amendment, the fourteenth amendment, and the commerce clause.

At oral argument counsel for defendants forthrightly stated their opinion that the thirteenth amendment was neither authority for nor prohibitory of this legislation. We agree, thereby rejecting the argument of plaintiffs that the effect of such act is to impose upon them a

5. 11 U.S.Code Cong. & Adm.News 1727–1891, 88th Cong., 2d Sess. (July 20, 1964).

6. V Cong.Rec. 4757, 4593–4598, 4643–4655, 4680–4681, 4833–4835, 4906, 5066–5072, 5091–5104; VI Cong.Rec. 5454–5458, 5539–5543, 5690–5693, 5770–5771, 5851–5855, 5865–5871, 5879–5889, 6003, 6212–6214, 6234–6240; VII Cong.Rec. 6307, 6334–6344, 7039–7041; VIII Cong.Rec. 7552–7558, 7677–7684, 7816–7825, 7837–7854, 7966–7967, 8029, 8092, 8371, 8805–8806; IX Cong.Rec. 8849 (1964).

condition of involuntary servitude in violation of such amendment.[7]

█ It cannot be successfully contended that the above quoted portions of the act may be constitutionally applied to these plaintiffs under the grant of legislative power contained in the fourteenth amendment[8] since it was conceded at oral argument that the State of Alabama, in none of its manifestations, has been involved in the private conduct of plaintiffs in refusing to serve food to Negroes for consumption on the premises. Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); Peterson v. Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963).

In any discussion of the commerce clause as a grant of power to the national government to regulate activities commonly described as private and local we keep in mind the admitted fact that a majority of sincere and conscientious members of Congress believed this legislation to be in the national interest and necessary to end practices which they considered debasing to human dignity. Of course, we express no opinion as to the wisdom of the legislation and confine our consideration to the constitutionality of the provisions with which we are concerned.

The commerce clause, appearing in article 1, section 8 of the Constitution, reads as follows:

"The Congress shall have Power * * *.

* * * * * *

"To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

* * * * * *

"* * * [And] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers * * *."

The language is simple and unadorned. It has remained unchanged since 1789. With reference to it, to allay popular misgivings as to the nature and extent of powers vested in the Union by the new Constitution, James Madison wrote, "The regulation of commerce, it is true, is a new power; but that seems to be an addition which few oppose, and from which no apprehensions are entertained."[9] And Alexander Hamilton made it clear that the commerce clause was intended to restrain the "interfering and unneighborly regulations of some states."[10] In spite of its simplicity and clarity and because of the constantly increasing "interpenetrations of modern society,"[11] it has spawned thousands of cases.

In Civil Rights Cases, 109 U.S. 3 (1883), at page 10, 3 S.Ct. 18, at page 20, Mr. Justice Bradley characterized section 1 of the Civil Rights Act of 1875: "Its effect is to declare that in all inns, public conveyances, and places of amusement, colored citizens, whether formerly slaves or not, and citizens of other races, shall have the same accommodations and privileges in all inns, public conveyances, and places of amusement, as are enjoyed by white citizens; and vice versa." Thereafter, he posed and answered a question: "Has congress constitutional power to make such a law? Of course, no one will contend that the power to pass it was contained in the constitution before the adoption of the last three amendments [thirteenth, fourteenth and fifteenth]." Since the commerce clause had been in the Constitution for almost one hundred years and since we are advised

7. Compare: Butler v. Perry, 240 U.S. 328, 36 S.Ct. 258, 60 L.Ed. 672 (1916); Brown Holding Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877 (1921); State v. Sprague, 200 A.2d 206 (New Hampshire Sup.Ct.1964); Scheiber, The Thirteenth Amendment and Freedom of Choice in Personal Service Occupations: A Reappraisal, 49 Cornell L.Q. 508 (1964).

8. Section 5 thereof reads as follows: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

9. The Federalist No. 45 (Madison).

10. The Federalist No. 22 (Hamilton).

11. Polish Nat. Alliance v. National Labor Relations Board, 322 U.S. 643, 650, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944).

that the Solicitor General in brief had urged upon the court the sufficiency of its grant of power to sustain the challenged legislation, Mr. Justice Bradley's pronouncement is, to say the least, highly intriguing and might be accorded more than persuasive authority but for the subsequent statement in Butts v. Merchants' & Miners' Transp'n Co., 230 U.S. 126 (1913), at page 132, 33 S.Ct. 964, at page 965, 57 L.Ed. 1422:

"The question of the constitutional validity of those sections came before this court in Civil Rights Cases, 109 U.S. 3, 27 L.Ed. 836, 3 Sup.Ct.Rep. 18, and upon full consideration it was held (a) that they received no support from the power of Congress to regulate interstate commerce because, as is shown by the preamble and by their terms, they were not enacted in the exertion of that power * * *."

While we shall not attempt the impossible task of a precise delineation of the contours of the power to regulate interstate commerce granted the Congress or the Herculean labor of analyzing the multitudinous cases dealing with various aspects of what may be termed primary and implied power, we shall make an effort to distill from the decided cases a definitive statement of such power which may be applied to this case only.

Some presuppositions are permissible; indeed they are required by the teaching of Wickard v. Filburn, 317 U.S. 111, 120, 63 S.Ct. 82, 87, "At the beginning Chief Justice Marshall described the federal commerce power with a breadth never yet exceeded. Gibbons v. Ogden, 9 Wheat. 1, 194, 195, 6 L.Ed. 23."; of Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518, "* * * commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business."; of

The Pipe Line Cases, 234 U.S. 548, 560–561, 34 S.Ct. 956, 958, 58 L.Ed. 1459, "The control of Congress over commerce among the states cannot be made a means of exercising powers not entrusted to it by the Constitution * * *."; and, of National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893, "The authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a State. That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system."

■■ Proceeding to explicate our understanding of the nature and extent of the power with which we are concerned, it is quite unnecessary to labor the obvious, that the commerce clause constitutes an express grant of power to Congress to regulate interstate commerce, which consists of the movement of persons, goods or information from one state to another. The cases are legion sustaining its exercise in this area.[12] Its power is not restricted, however, to the regulation of interstate commerce. Congress is further invested with the power to regulate intrastate activities, but only to the extent that action on its part is necessary or appropriate to the effective execution of its expressly granted power to regulate interstate commerce.

■ The power of Congress to regulate wholly intrastate activities is brought into play only when those activities have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from practices within a state which burden its freedom or ob-

---

12. E.g. United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955); United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955); Radovich v. National Football League, 352 U.S. 445, 455, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945).

struct its flow.[13] The exercise of such power must necessarily be prospective, for the reason that, unlike Tennyson's brook, interstate commerce does not run on forever. At some time it must come to an end within the boundaries of some state.[14]

This century has witnessed a dynamic expansion of federal control not only of the movements of commerce between the states but also of intrastate activities which have been found to burden its freedom or obstruct its flow. Thus Congress has exercised its power granted by the commerce clause to enact the Robinson-Patman Act,[15] the Federal Food, Drug and Cosmetic Act,[16] the White Slave Laws,[17] the Gambling Devices Transportation Act,[18] the Agricultural Adjustment Act of 1938,[19] the Fair Labor Standards Act,[20] and the National Labor Relations Act,[21] among others.

Concededly, the latter three, in broad extension of federal control, have immediate, direct, and practical impacts upon activities which were at one time considered wholly intrastate in nature thus resting in the domain of state control.

In each instance Congress cautiously made clear legislative findings that the regulation of the intrastate practices dealt with was necessary or appropriate to the effective execution of its expressly granted power to regulate interstate commerce. In the National Labor Relations Act such findings are set forth in 29 U.S.C.A. § 151. Moreover, assurance was given that regulation of essentially local matters would apply only where there was an actual effect on interstate commerce by requiring that this be determined administratively or judicially on a record in each individual case. 29 U.S.C.A. §§ 159(c) and 160(a). In the Agricultural Adjustment Act Congress made elaborate findings to establish an effect on commerce of the intrastate activities sought to be regulated. 7 U.S.C.A. §§ 1311, 1321, 1331, 1341, 1351, 1357, 1379a, and 1380a.

The Fair Labor Standards Act contains a built-in limitation on its enforcement by requiring a judicial determination of the ultimate fact that acts of employers or employees actually affect such commerce on a case by case basis.

The Civil Rights Act of 1964 contains no legislative findings and we proceed to a critical examination of its provisions to determine whether it may nevertheless successfully survive the constitutional challenge. It is our opinion that neither

13. United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L. Ed. 726 (1942); Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947); Santa Cruz Fruit Packing Co. v. N. L. R. B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954 (1938); National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615 (1937); Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938); National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L. Ed. 1014 (1939); United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

14. Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23 (1824); Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855 (1936); Welton v. Missouri, 91 U.S. 275, 23 L.Ed. 347 (1875); Bowman v. Chicago & N. W. Ry., 125 U.S. 465, 8 S.Ct. 689, 31 L.Ed. 700 (1888); Packer Corporation v. Utah, 285 U.S. 105, 52 S.Ct. 273, 76 L.Ed. 643 (1932); State of Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931); Yonkers v. United States, 320 U.S. 685, 64 S.Ct. 327, 88 L.Ed. 400 (1944); Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939).

15. 52 Stat. 446, 15 U.S.C.A. § 13c.

16. 52 Stat. 1040, as amended, 21 U.S.C.A. §§ 301–392.

17. 36 Stat. 825, as amended, 18 U.S.C.A. §§ 2421–2424.

18. 64 Stat. 1134, 15 U.S.C.A. §§ 1171–1178.

19. 52 Stat. 31, as amended, 7 U.S.C.A. §§ 1281–1407.

20. 52 Stat. 1060, as amended, 29 U.S.C.A. §§ 201–219.

21. 49 Stat. 449, as amended, 29 U.S.C.A. §§ 151–168.

of the three above-mentioned acts is an apposite analogy and that the cases arising thereunder afford scant persuasive authority beyond the broad principles enunciated therein.[22]

■ The duty of this court is classically defined in United States v. Butler, 297 U.S. 1, at pages 62 and 63, 56 S.Ct. 312, at page 318, 80 L.Ed. 477:

"There should be no misunderstanding as to the function of this court in such a case. It is sometimes said that the court assumes a power to overrule or control the action of the people's representatives. This is a misconception. The Constitution is the supreme law of the land ordained and established by the people. All legislation must conform to the principles it lays down. When an act of Congress is appropriately challenged in the courts as not conforming to the constitutional mandate, the judicial branch of the government has only one duty; to lay the article of the Constitution which is invoked beside the statute which is challenged and to decide whether the latter squares with the former. All the court does, or can do, is to announce its considered judgment upon the question. The only power it has, if such it may be called, is the power of judgment. This court neither approves nor condemns any legislative policy. Its delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution; and, having done that, its duty ends.

"The question is not what power the federal government ought to have, but what powers in fact have been given by the people. It hardly seems necessary to reiterate that ours is a dual form of government; that in every state there are two governments; the state and the United States. Each state has all governmental powers save such as the people, by their Constitution, have conferred upon the United States, denied to the states, or reserved to themselves. The federal union is a government of delegated powers. It has only such as are expressly conferred upon it and such as are reasonably to be implied from those granted. In this respect we differ radically from nations where all legislative power, without restriction or limitation, is vested in a parliament or other legislative body subject to no restrictions except the discretion of its members."

Paraphrased, for clarity of discussion, title II of the act declares that no restaurant may refuse service to any person because of his race, color, religion, or national origin either if it serves or offers to serve interstate travelers or a substantial portion of the food which it serves has moved in commerce.

No case has been called to our attention, we have found none, which has held that the national government has the

22. That the National Labor Relations Act may not be analogized to the Civil Rights Act of 1964 and that the power of Congress is not plenary with respect to the regulation of activities not themselves interstate commerce is made crystal clear by Mr. Justice Black's concurring opinion in Polish Nat. Alliance v. National Labor Relations Board, 322 U.S. 643, 652, 64 S.Ct. 1196, 1201:

"The doctrine that Congress may provide for regulation of activities not themselves interstate commerce, but merely 'affecting' such commerce, rests on the premise that in certain fact situations the federal government may find that regulation of purely local and intrastate commerce is 'necessary and proper' to prevent injury to interstate commerce. * * * In applying this doctrine to particular situations this Court properly has been cautious, and has required clear findings before subjecting local business to paramount federal regulation. * * * It has insisted upon 'suitable regard to the principle that whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear.' * * *"

power to control the conduct of people on the local level because they may happen to trade sporadically with persons who may be traveling in interstate commerce. To the contrary, see Williams v. Howard Johnson's Restaurant, 268 F.2d 845 (4th Cir.1959); Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167 (8th Cir.1959); United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

On the authority of the cases collected in footnote 14, infra, we believe it to be a settled rule of constitutional law that goods cease to constitute a part of interstate commerce, and become a part of the general property in a state, and amenable to its laws, when they are sent into a state, either for the purpose of sale or in consequence of a sale. The simple truth of the matter is that Congress has sought to put an end to racial discrimination in all restaurants wherever situated regardless of whether there is any demonstrable causal connection between the activity of the particular restaurant against which enforcement of the act is sought and interstate commerce.

If our premise is correct, Congress sought to achieve its end by the sophisticated means of first declaring a restaurant is a place of public accommodation if its operations affect commerce and by thereafter abandoning the "affect commerce" requirement by legislating what is tantamount to a conclusive presumption that its operations do affect commerce if it is proved either that it serves or offers to serve interstate travelers or that a substantial portion of the food which it serves has at some time, however remote, moved in commerce. The courts will not sustain a presumption when there is "no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience." Tot v. United States, 319 U.S. 463, at 467–468, 63 S.Ct. 1241, at 1245, 87 L.Ed. 1519. The issues presented in the instant case re-

quire our consideration of only that portion of the statute relating to restaurants which serve food "a substantial portion" of which "has moved in commerce."

If Congress has the naked power to do what it has attempted in title II of this act, there is no facet of human behavior which it may not control by mere legislative ipse dixit that conduct "affect[s] commerce" when in fact it does not do so at all, and rights of the individual to liberty and property are in dire peril.

We conclude that title II of the Civil Rights Act of 1964, as applied to the business operated by these plaintiffs, was beyond the competence of Congress to enact and that its enforcement against plaintiffs under the circumstances of this case would be violative of the fifth amendment of the Constitution of the United States, in pertinent part reading: "No person shall be * * * deprived of * * *, liberty, or property, without due process of law; * * *." Accordingly, they are entitled to the relief for which they pray.