**John V. TWITTY and Yvonne M. Twitty, individually and as representatives of a class, Plaintiffs,**

**v.**

**VOGUE THEATRE CORPORATION and William C. Carroll, as Manager of the Vogue Theatre, Defendants.**

**Civ. No. 64–127–ORL.**

United States District Court
M. D. Florida,
Orlando Division.

March 9, 1965.

Norris D. Woolfork III, Orlando, Fla., Earl M. Johnson, Jacksonville, Fla., Jack Greenberg, Constance Barker Motley, Leroy D. Clark, New York City, for plaintiffs.

Gurney, Gurney & Handley, Orlando, Fla., for defendants.

GEORGE C. YOUNG, District Judge.

## AMENDED
## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

This case was filed on November 5, 1964, pursuant to Title II of Public Law 88–352 (The Civil Rights Act of 1964). Plaintiffs John V. Twitty and Yvonne M. Twitty, Negroes, claimed the defendants, Vogue Theatre Corporation and its man-ager, William C. Carroll, on August 1, 1964, refused to admit the plaintiffs to the Vogue Theatre because of a policy of discriminating against Negroes. The complainant sought an injunction to restrain the defendants from continuing or maintaining a policy of discrimination against either the plaintiffs or members of the class for which the suit was brought. Attorney's fee and costs were also sought.

Motions to dismiss were filed on behalf of both defendants on December 4, 1964; on December 5, 1964, this Court noticed the motions for hearing on December 18, 1964.

On December 11, 1964, plaintiffs' counsel moved for postponement of the hearing set for December 18; that day the motion was granted and the hearing reset for January 6, 1965.

On December 28, 1964, plaintiffs' counsel filed a "Suggestion for Correction of Defendant's Name", so as to change the name of the corporate defendant in the cause from Vogue Theatre Corporation to Vogue Theatre, Inc. of Orlando.

After hearing on January 6, 1965, this Court entered an Order changing the name of the corporate defendant; counsel for defendants advised the Court that the defendants had no objection to the granting of the suggestion of the name change. The Motion to Dismiss was denied and the defendants given ten days to file their answers and five days to comply with Rule 15 of the Civil Rules of the District Court for the Middle District of Florida if they wished to raise a question of constitutionality of the provisions of the Civil Rights Act of 1964 under which this case was brought. The Court refused to hear constitutional arguments on the Motion to Dismiss since Rule 15 of the local rules had not been theretofore followed by the defendants.

On January 11, 1965, the defendants' counsel filed "Notice of Intent to Challenge the Constitutionality of an Act of Congress."

On January 13, 1965, this Court, pursuant to Section 2403, Title 28, U.S.

Code, certified to the Attorney General of the United States that the constitutionality of a portion of Title II of the Civil Rights Act of 1964 had been drawn in question in the case.

On January 15, 1965, an answer was filed by Vogue Theatre Inc. of Orlando and William C. Carroll; on January 20, 1965, this Court noticed the case for non-jury trial on February 16, 1965.

On February 15, 1965, an Order was entered granting the application of the United States of America for leave to intervene as a party; the trial was held on February 16 and 17, 1965.

The Vogue Theatre involved in this case is a neighborhood motion picture house located in an area of Orlando, Florida, outside the downtown section. It is independently owned; that is, it is not a part of any chain.

The Vogue Theatre is a "21 day theatre" which means in film distribution parlance that it is in line to get a film 21 days after the film's first run at a "first run theatre" in Orlando.

There are approximately 60 theatres in the Orlando area (within one hour's drive in any direction); 20 of those 60 are "first run theatres".

Defendants raise a number of issues as follows:

### CHANGE OF CORPORATE NAME

█ Defense trial counsel contended only "Vogue Theatre Corporation" was ever served and that no service of process was ever made on the corporate defendant by its correct name, Vogue Theatre Inc. of Orlando. This argument is without merit because trial counsel's associate consented to the change of defendant's name on January 6, 1965, and this Court entered an Order accordingly.

Although in its answer filed January 15, 1965, Vogue Theatre Inc. of Orlando, in Paragraph 2 thereof, maintained that it had not been served with process and thus was not subject to the jurisdiction of this Court, I construe that the failure to object to the granting of the suggestion of name change as incorporated in the Order of this Court on January 6, 1965, constituted a waiver by defense counsel of this defense and that, therefore, Vogue Theatre Inc. of Orlando is properly before this Court.

### WAS DISCRIMINATION SHOWN?

Defendants—who offered no evidence —next contend that plaintiffs' evidence failed to establish any discrimination by either of the defendants against the plaintiffs. Each of the plaintiffs testified in open court and the deposition of defendant, William C. Carroll, was read which deposition contained the following questions and answers by Carroll:

"Q. Would you state your occupation again, please?

"A. Theatre Manager of the Vogue Theatre.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. On or about August 1, 1964, were you employed at the Vogue Theatre?

"A. I was.

"Q. Were you employed as manager?

"A. I was.

"Q. Were you at work in the Vogue Theatre on or about August 1, 1964?

"A. I was.

"Q. Were you there at work about 3:00 P.M., that day?

"A. I was.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Mr. Carroll, as Manager of the Vogue Theatre do you have authority or do you participate in establishing policy of the theatre, such as the price of tickets, hours of opening, and apparel required to be worn?

"A. I participate in the policy, yes.

&ast; &ast; &ast; &ast; &ast; &ast;

"Q. Is the Vogue Theatre open to the public?

"A. Yes.

"Q. That means the general public?

"A. General public, yes.

"Q. Is it a private club?

"A. No.

"Q. No membership is required for admittance to the theatre?

"A. No.

"Q. Does the Vogue Theatre admit Negroes?

"A. No.

\* \* \* \* \* \*

"Q. Mr. Carroll, you said earlier, I believe, that the Vogue Theatre does not admit negro patrons?

"A. That's right.

"Q. And my question now is: Is this a policy of the theatre?

"A. Presently it is. '

\* \* \* \* \* \*

"Q. Mr. Carroll, directing your attention again to on or about August 1, 1964, at approximately three o'clock P.M., were you in the theatre on that date and at that time?

"A. I was.

"Q. Do you remember talking to two Negroes at that time?

"A. Yes.

"Q. Were they seeking admission to the theatre?

"A. Yes.

"Q. Were they denied or granted permission to the theatre?

"A. They were denied.

■■ From the evidence adduced I find the plaintiffs were denied admission to the Vogue Theatre on August 1, 1964, because of their race and pursuant to a policy of that theatre not to admit Negroes. Such action was "discrimination" within the meaning of Section 201 (a) of Title II, Civil Rights Act of 1964. I further find that such denial was performed by Vogue Theatre Inc. of Orlando and William C. Carroll as the operator and manager, respectively, of the Vogue Theatre.

## CLASS ACTION?

■ Defendants also argue that there is no basis for plaintiffs bringing their complaint as a class action. This contention is without merit, also, for there are common questions of law and fact affecting the several rights of all Negroes in the Orlando area. Obviously the number of persons constituting the class (Negroes in Orlando area) are so numerous as to make it impracticable to bring them all before the Court. Rule 23, F.R. Civ.P.; Potts v. Flax, 5 Cir., 313 F.2d 284 (1963).

## CONSTITUTIONALITY

■ The defendants next attack the constitutionality of Section 201(c) (3) of Title II of the Act.

As pertinent here, and in brief, Section 201(a) of the Act provides that all persons shall be entitled to full and equal enjoyment of places of public accommodation without discrimination on the ground of race, color, religion or national origin; Section 201(b) (3) defines any motion picture house as a place of public accommodation within the meaning of Title II "if its operations affect commerce". In Section 201(c) (3) Congress has provided that the operations of a motion picture house affect commerce if "it customarily presents films \* \* \* which move in commerce."

In the case of McClung v. Katzenbach, 233 F.Supp. 815 (Ala.1964), that three judge district court stated in reference to Title II as applied to restaurants:

"If our premise is correct, Congress sought to achieve its end by the sophisticated means of first declaring a restaurant is a place of public accommodation if its operations affect commerce and by thereafter abandoning the 'affect commerce' requirement by legislating what is tantamount to a conclusive presumption that its operations do affect commerce if it is proved either that it serves or offers to serve interstate travelers or that a substantial portion of the food which it serves has at some time, however remote, moved in commerce. The courts will not sustain a presumption when there is 'no rational connection be-

tween the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience.' Tot v. United States, 319 U.S. 463, at 467–468, 63 S.Ct. 1241, at 1245, 87 L.Ed. 1519. The issues presented in the instant case require our consideration of only that portion of the statute relating to restaurants which serve food 'a substantial portion' of which 'has moved in commerce.'

"If Congress has the naked power to do what it has attempted in title II of this act, there is no facet of human behavior which it may not control by mere legislative ipse dixit that conduct 'affect(s) commerce' when in fact it does not do so at all, and rights of the individual to liberty and property are in dire peril."

However, on December 14, 1964, the Supreme Court of the United States reversed the aforesaid McClung v. Katzenbach in the case of Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 and on the same day rendered its decision and opinions in the case of Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258. Whereas the McClung cases dealt with Sub-section 201(c) (2) of Title II (pertaining to restaurants), the Heart of Atlanta Motel case dealt with Sub-section 201(c) (1) of Title II of the Act (pertaining to a motel which provides lodging to transit guests). Although the Sub-section under scrutiny in the case at bar—201(c) (3)—is different than those specifically passed on in the McClung and Heart of Atlanta Motel cases, the Supreme Court decisions and the reasonings therefore are both binding on this Court and determinative of the issue of constitutionality.

In Heart of Atlanta Motel, Mr. Justice Clark, in speaking for the Court, found that the Act did not deprive the appellant there of liberty or property under the Fifth Amendment nor was it a taking of property without just compensation nor did it constitute "involuntary servitude" as prohibited by the Thirteenth Amendment, all as argued by defendants here.

Defendants next contend the conclusive presumption that all moving picture houses meeting the criteria set out in the Act "affect commerce" is an unconstitutional exercise by Congress of its power to legislate under the Commerce Clause. In this respect, Mr. Justice Clark in Heart of Atlanta Motel said:

"* * * The commerce power invoked here by the Congress is a specific and plenary one authorized by the Constitution itself. The only questions are: (1) whether Congress had a rational basis for finding that racial discrimination by motels affected commerce, and (2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appropriate. If they are, appellant has no 'right' to select its guests as it sees fit, free from governmental regulation."

In the same case, Mr. Justice Black in a concurring opinion stated:

"The choice of policy is of course within the exclusive power of Congress; but whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court."

To determine whether Congress had a "rational basis" for finding that racial discrimination by motels affected commerce the Supreme Court in Heart of Atlanta Motel reviewed the basis for the Congressional action and specifically referred to various hearings before Congressional Committees and the Court concluded its review with the following statement:

"We shall not burden this opinion with further details since the voluminous testimony presents overwhelming evidence that discrimination by hotels and motels impedes interstate travel."

The Supreme Court made it clear that the power of Congress to regulate under the Commerce Clause is not to be determined by the effect on commerce of one event alone but by the effect that such event added to others of a similar nature might have on commerce. Mr. Justice Black said:

"* * * But in deciding the constitutional power of Congress in cases like the two before us we do not consider the effect on interstate commerce of only one isolated, individual, local event, without regard to the fact that this single local event when added to many others of a similar nature may impose a burden on interstate commerce by reducing its volume or distorting its flow."

and in the McClung case, Mr. Justice Clark speaking for the Court, said:

"It goes without saying that, viewed in isolation, the volume of food purchased by Ollie's Barbecue from sources supplied from out of state was insignificant when compared with the total foodstuffs moving in commerce. But, as our late Brother Jackson said for the Court in Wickard v. Filburn, 317 U.S. 111, [63 S. Ct. 82, 87 L.Ed. 122] (1942):

"'That appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.' (At 127–128, 63 S.Ct. at 90.")

In the case at bar this Court requested Government counsel to provide the Court with a copy of those portions of the transcript of the various hearings before Congress on the Act which related to motion picture theatres. The acting Assistant Attorney General of the Civil Rights Division, acting through the Chief of Appeals and Research Section, forwarded that information which is attached hereto as Appendix "A". A covering letter from the Chief of the Appeals and Research Section stated:

"* * * Although our research of the legislative history of the Act has not been exhaustive, we are confident that the enclosed materials include all of the significant statements concerning theatres."

If, in fact, Appendix "A" does constitute all of the significant statements concerning theatres, such material falls far short of the "voluminous evidence" referred to by the Supreme Court in the Heart of Atlanta Motel case concerning motels.

However, while the Supreme Court referred to the voluminous Congressional hearings, it does not appear that any volume of testimony or evidence was necessarily required for a finding by that Court that the Congress acted "rationally". In his concurring opinion in Heart of Atlanta, Mr. Justice Black also said:

"Congress concluded that restaurants that purchased a substantial quantity of goods from other States might well burden and disrupt the flow of interstate commerce if allowed to practice racial discrimination, because of the stifling and distorting effect that such discrimination on a wide scale might well have on the sale of goods shipped across state lines. *Certainly this belief would not be irrational even had there not been a large body of evidence before the Congress to show the probability of this adverse effect.*" (Emphasis added.)

So in using the rationale of the Heart of Atlanta Motel and McClung cases as a yard stick with which to measure the merits of the defendants' contentions of unconstitutionality of Sub-section 201 (c) (3), it cannot now be said that Congress acted irrationally in the enactment of the criteria set forth therein and the contention of unconstitutionality of the sub-section fails.

### FILMS IN COMMERCE?

■ The defendants next contend that even if the Act is constitutional as

applied to the Vogue Theatre, the films customarily presented by that theatre do not move in commerce. The undisputed evidence showed that the films presented by the Vogue Theatre were all produced out of the State of Florida and were shipped to Florida for distribution to various theatres.

Jacksonville Film Services, Inc., is a corporation located in Jacksonville, Florida, which receives films from all (except three) of the film producers in a different form than that in which subsequently shipped throughout Florida for showing. After receipt, Jacksonville Film Services Inc. processes the film and mounts it on shipping reels. Instructions for shipping to various theatres throughout Florida are received from the local agency representing the producing company, such as, Metro-Goldwyn-Mayer, Warner Brothers or Columbia Pictures. Films are shown by a theatre and then returned by that theatre either to Jacksonville or to the next theatre in Florida which has been scheduled for the next subsequent showing of that particular film. In some rare cases the film is sent by a Florida theatre to an area outside Florida where for some reason a film is urgently required.

The films produced outside Florida are unquestionably in interstate commerce from the time they are shipped from the production laboratory to Jacksonville Film Services, Inc. Defendants contend that upon reaching the latter location in Jacksonville the films come to rest and that the subsequent movements in Florida are solely intrastate commerce and not movements "in commerce" within the contemplation of Sub-section 201(c)(3).

The defendants are correct in their contention that the films are not "in commerce" in their movements only from Jacksonville to points in Florida and from such points to other Florida points or back to Jacksonville—but the Act does not restrict the time for determining the nature of the movement of the film—the test is whether the film moves in commerce as a part of its usual dis-

tribution throughout the country. Here all the films moved in commerce to and from Florida. In the Heart of Atlanta case the Supreme Court held that Congress under the Commerce Clause may regulate a local activity which Congress has found affects interstate commerce. There Mr. Justice Black said:

"Furthermore, it has long been held that the Necessary and Proper Clause, Art. 1, § 8, cl. 18, adds to the commerce power of Congress the power to regulate local instrumentalities operating within a single state if their activities burden the flow of commerce among the States. Thus in the Shreveport Case, Houston, E. & W. T. R. Co. v. United States, 234 U.S. 342, 353–354, [34 S.Ct. 833, 837, 58 L.Ed. 1341], this Court recognized that Congress could not fully carry out its responsibility to protect interstate commerce were its constitutional power to regulate that commerce to be strictly limited to prescribing the rules for controlling the things actually moving in such commerce or the contracts, transactions, and other activities, immediately concerning them. Regulation of purely intrastate railroad rates is primarily a local problem for state rather than national control. But the Shreveport Case sustained the power of Congress under the Commerce Clause and the Necessary and Proper Clause to control purely intrastate rates, even though reasonable, where the effect of such rates was found to impose a discrimination injurious to interstate commerce. This holding that Congress had power under these clauses, not merely to enact laws governing interstate activities and transactions, but also to regulate even purely local activities and transactions where necessary to foster and protect interstate commerce, was amply supported by Mr. Justice (later Mr. Chief Justice) Hughes' reliance upon many prior holdings of this Court extending back to Gib-

bons v. Ogden, supra [9 Wheat. 1, 6 L.Ed. 23]. And since the Shreveport Case this Court has steadfastly followed, and indeed has emphasized time and time again, that Congress has ample power to protect interstate commerce from activities adversely and injuriously affecting it, which but for this adverse effect on interstate commerce would be beyond the power of Congress to regulate."

and in the McClung case, Mr. Justice Clark stated:

" * * * Much is said about a restaurant business being local but 'even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce * *' Wickard v. Filburn, supra, at 125, [63 S.Ct. at 89]. The activities that are beyond the reach of Congress are 'those which are completely within a particular State, which do not affect other States, and with which it it is not necessary to interfere, for the purpose of executing some of the general powers of the government.' Gibbons v. Ogden, 9 Wheat. 1, 195, [6 L.Ed. 23] (1824). This rule is as good today as it was when Chief Justice Marshall laid it down almost a century and a half ago.

"This Court has held time and again that this power extends to activities of retail establishments, including restaurants, which directly or indirectly burden or obstruct interstate commerce. We have detailed the cases in Heart of Atlanta Motel, supra, and will not repeat them here.

"*Nor are the cases holding that interstate commerce ends when goods come to rest in the state of destination apposite here. That line of cases has been applied with reference to state taxation or regula-*

*tion but not in the field of federal regulation.*" (Emphasis added.)

The Interstate shipments to and from Florida of the films customarily presented by the Vogue Theatre were movements "in commerce" as contemplated by Section 201(c) (3) of the Act, and, for the quoted reasons set forth above from the cited Supreme Court opinions, are sufficient to permit federal regulation of a "local activity" where Congress has not irrationally found that the operations of such activity "affect commerce". So defendants' argument on this point also fails and the plaintiffs are entitled under the law to the relief sought by their Complaint.

### ATTORNEY'S FEE

The plaintiffs seek an allowance of a reasonable attorney's fee as a part of the costs as permitted, in the discretion of the Court, by Section 204(b), Title II of the Act. A reasonable attorney's fee for the services rendered by plaintiffs' counsel would be the amount of $500.00. However, the allowance of all or any part thereof is a matter within the discretion of the Court.

The occasion giving rise to this suit occurred just one month after the Civil Rights Act of 1964 became law and at a time when some respectable authorities believed that at least some portions of the Civil Rights Act of 1964 were unconstitutional (for example, the three judge district court in case of McClung v. Katzenbach, D.C., 233 F.Supp. 815, cited on page 284 of these Findings of Fact and Conclusions of Law).

On August 1, 1964, the Supreme Court had not yet decided Katzenbach v. McClung and Heart of Atlanta Motel, Inc. v. United States, which controlled the basic issues in this case. Furthermore, until this suit, so far as this Court knows, there has been no reported decision involving Section 201(c) (3) of the Act.

There is no reason to assume that the defendants have acted for any reason other than because of a good faith belief that the Act was unconstitutional as applied to their operation. Consequently,

to tax the full attorney's fee as a cost would under the circumstances of this case constitute an undue penalty and not be in the best interests of justice.

Therefore, of the reasonable attorney's fee of $500.00, only the sum of $100.00 should be taxed as costs.

In accordance with these Findings of Fact and Conclusions of Law, in the form of a Memorandum Opinion, an Order granting the Petition for Injunction will be entered including an allowance for costs incurred and a reasonable attorney's fee of $100.00.

## APPENDIX A

TABLE III.—*Average family expenditure for admissions, food eaten away from home, and automobile operations, for 3 income classes, large northern and southern cities, by race, 1950*

| Income class and region | Admissions | | | Food eaten away from home | | | Automobile operation | | |
|---|---|---|---|---|---|---|---|---|---|
| | Negro | White | Negroes percent of whites | Negro | White | Negroes percent of whites | Negro | White | Negroes percent of whites |
| $2,000 to $3,000: | | | | | | | | | |
| Large northern cities.. | $31 | $29 | 107 | $148 | $184 | 80 | $52 | $86 | 60 |
| Large southern cities.. | $23 | $36 | 64 | $113 | $194 | 58 | $52 | $95 | 55 |
| Northern expenditures as percent of southern ............... | 135 | 81 | ......... | 131 | 95 | ......... | 100 | 91 | ......... |
| $3,000 to $4,000: | | | | | | | | | |
| Large northern cities.. | $45 | $37 | 122 | $138 | $170 | 81 | $67 | $158 | 42 |
| Large southern cities.. | $37 | $39 | 95 | $117 | $180 | 65 | $86 | $170 | 51 |
| Northern expenditures as percent of southern ............... | 122 | 95 | ......... | 118 | 94 | ......... | 78 | 93 | ......... |
| $4,000 to $5,000: | | | | | | | | | |
| Large northern cities.. | $57 | $48 | 119 | $182 | $234 | 78 | $148 | $220 | 67 |
| Large southern cities.. | $39 | $45 | 87 | $166 | $257 | 65 | $136 | $225 | 60 |
| Northern expenditures as percent of southern ............... | 146 | 107 | ......... | 110 | 91 | ......... | 109 | 98 | ......... |

Source: "Study of Consumer Expenditure Income and Saving," tabulated by Bureau of Labor Statistics, U.S. Department of Labor, for Wharton School of Finance and Commerce, University of Pennsylvania, Philadelphia, Pa., 1956–57.

Copied from Hearings Before The Committee on Commerce, United States Senate Eighty-Eighth Congress, First Session on S. 1732, Part 2, Serial 27.

———◆———

*Materials from the Legislative History of the Civil Rights Act of 1964 Relating to Motion Picture Theaters*

The Under Secretary of Commerce told the committee that discriminatory practices in places of entertainment or amusement not only artificially restrict the demand for entertainment, but also that—

> Where segregation is practiced in theaters and auditoriums, the entire community, both white and Negro, is denied access to a variety of cultural and entertainment activities.

The Metropolitan Opera Co. canceled its annual season in Birmingham because municipal authorities failed to desegregate theater facilities. Although they had formerly had very successful seasons in Birmingham, there are no plans for resumption in the immediate future.

Actors' Equity adopted a rule about a year ago, written into every contract, that performers need not perform in theaters where discrimination is practiced either against performers or patrons.

Entertainers in the American Guild of Variety Artists have also been refusing to book where either the stage or the audience is segregated. The guild's resolution is fairly recent, but many of the booking agencies have insisted upon this clause for a long time. (Senate Report No. 872, 88th Cong., 2nd Sess., p. 20).

\* \* \* \* \* \*

Motion picture theaters which refuse to admit Negroes, or which discriminate in other ways is the next subject of my statement.

I do not like constantly to refer to Negroes when I discuss the subject of discrimination, because discrimination can apply to many other people besides Negroes. It applies to many races. In my part of the country there are some potent illustrations of discrimination in the past applying to orientals. So when I speak of discrimination I include all who are discriminated against.

Motion picture theaters which refuse to admit Negroes will obviously draw patrons from a narrower segment of the market than if they were open to patrons of all races. The difference will often not be made up by separate theaters for Negroes because there are localities which can support one theater but not two—or two but not three, and so forth—and because the inferior economic position in which racial discrimination has held Negroes often makes their business alone financially inadequate to support a theater. Thus, the demand for films from out of State, and the royalties from such films, will be less. What is true of exclusion is true, although perhaps in less degree, of segregation. Given any particular performance, a segregated theater may well lack sufficient seating space for white patrons while offering ample seating in the Negro section, or vice versa. Moreover, the very fact of segregation in

seating discourages attendance by those offended by such practices. Speech by Senator Warren Magnuson, Congressional Record, April 9, 1964, p. 7174 (daily edition).