# HEART OF ATLANTA MOTEL, INC. *v.* UNITED STATES ET AL.

No. 515.   Argued October 5, 1964.—Decided December 14, 1964.

*Moreton Rolleston, Jr.,* argued the cause and filed a brief for appellant.

*Solicitor General Cox* argued the cause for the United States et al. With him on the brief were *Assistant Attorney General Marshall, Philip B. Heymann* and *Harold H. Greene.*

Briefs of *amici curiae,* urging reversal, were filed by *James W. Kynes,* Attorney General of Florida, and *Fred M. Burns* and *Joseph C. Jacobs,* Assistant Attorneys General, for the State of Florida; and *Robert Y. Button,* Attorney General of Virginia, and *Frederick T. Gray,* Special Assistant Attorney General, for the Commonwealth of Virginia.

Briefs of *amici curiae,* urging affirmance, were filed by *Thomas C. Lynch,* Attorney General of California, *Charles E. Corker* and *Dan Kaufmann,* Assistant Attorneys General, and *Charles B. McKesson* and *Jerold L. Perry,* Deputy Attorneys General, for the State of California; *Edward W. Brooke,* Attorney General of Massachusetts, for the Commonwealth of Massachusetts; and *Louis J. Lefkowitz,* Attorney General of New York, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Shirley Adelson Siegel,* Assistant Attorney General, for the State of New York.

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a declaratory judgment action, 28 U. S. C. § 2201 and § 2202 (1958 ed.), attacking the constitutionality of Title II of the Civil Rights Act of 1964, 78 Stat.

241, 243.[1]  In addition to declaratory relief the complaint sought an injunction restraining the enforcement of the Act and damages against appellees based on allegedly resulting injury in the event compliance was required. Appellees counterclaimed for enforcement under § 206 (a) of the Act and asked for a three-judge district court under § 206 (b).  A three-judge court, empaneled under § 206 (b) as well as 28 U. S. C. § 2282 (1958 ed.), sustained the validity of the Act and issued a permanent injunction on appellees' counterclaim restraining appellant from continuing to violate the Act which remains in effect on order of MR. JUSTICE BLACK, 85 S. Ct. 1.  We affirm the judgment.

## 1. The Factual Background and Contentions of the Parties.

The case comes here on admissions and stipulated facts. Appellant owns and operates the Heart of Atlanta Motel which has 216 rooms available to transient guests.  The motel is located on Courtland Street, two blocks from downtown Peachtree Street.  It is readily accessible to interstate highways 75 and 85 and state highways 23 and 41.  Appellant solicits patronage from outside the State of Georgia through various national advertising media, including magazines of national circulation; it maintains over 50 billboards and highway signs within the State, soliciting patronage for the motel; it accepts convention trade from outside Georgia and approximately 75% of its registered guests are from out of State.  Prior to passage of the Act the motel had followed a practice of refusing to rent rooms to Negroes, and it alleged that it intended to continue to do so.  In an effort to perpetuate that policy this suit was filed.

The appellant contends that Congress in passing this Act exceeded its power to regulate commerce under Art. I,

---

[1] See Appendix.

§ 8, cl. 3, of the Constitution of the United States; that the Act violates the Fifth Amendment because appellant is deprived of the right to choose its customers and operate its business as it wishes, resulting in a taking of its liberty and property without due process of law and a taking of its property without just compensation; and, finally, that by requiring appellant to rent available rooms to Negroes against its will, Congress is subjecting it to involuntary servitude in contravention of the Thirteenth Amendment.

The appellees counter that the unavailability to Negroes of adequate accommodations interferes significantly with interstate travel, and that Congress, under the Commerce Clause, has power to remove such obstructions and restraints; that the Fifth Amendment does not forbid reasonable regulation and that consequential damage does not constitute a "taking" within the meaning of that amendment; that the Thirteenth Amendment claim fails because it is entirely frivolous to say that an amendment directed to the abolition of human bondage and the removal of widespread disabilities associated with slavery places discrimination in public accommodations beyond the reach of both federal and state law.

At the trial the appellant offered no evidence, submitting the case on the pleadings, admissions and stipulation of facts; however, appellees proved the refusal of the motel to accept Negro transients after the passage of the Act. The District Court sustained the constitutionality of the sections of the Act under attack (§§ 201 (a), (b) (1) and (c) (1)) and issued a permanent injunction on the counterclaim of the appellees. It restrained the appellant from "[r]efusing to accept Negroes as guests in the motel by reason of their race or color" and from "[m]aking any distinction whatever upon the basis of race or color in the availability of the goods, services, facilities,

privileges, advantages or accommodations offered or made available to the guests of the motel, or to the general public, within or upon any of the premises of the Heart of Atlanta Motel, Inc."

## 2. *The History of the Act.*

Congress first evidenced its interest in civil rights legislation in the Civil Rights or Enforcement Act of April 9, 1866.[2] There followed four Acts,[3] with a fifth, the Civil Rights Act of March 1, 1875,[4] culminating the series. In 1883 this Court struck down the public accommodations sections of the 1875 Act in the *Civil Rights Cases*, 109 U. S. 3. No major legislation in this field had been enacted by Congress for 82 years when the Civil Rights Act of 1957[5] became law. It was followed by the Civil Rights Act of 1960.[6] Three years later, on June 19, 1963, the late President Kennedy called for civil rights legislation in a message to Congress to which he attached a proposed bill. Its stated purpose was

> "to promote the general welfare by eliminating discrimination based on race, color, religion, or national origin in . . . public accommodations through the exercise by Congress of the powers conferred upon it . . . to enforce the provisions of the fourteenth and fifteenth amendments, to regulate commerce among the several States, and to make laws necessary and proper to execute the powers conferred upon it by the Constitution." H. R. Doc. No. 124, 88th Cong., 1st Sess., at 14.

---

[2] 14 Stat. 27.

[3] Slave Kidnaping Act, 14 Stat. 50; Peonage Abolition Act of March 2, 1867, 14 Stat. 546; Act of May 31, 1870, 16 Stat. 140; Anti-Lynching Act of April 20, 1871, 17 Stat. 13.

[4] 18 Stat. 335.

[5] 71 Stat. 634.

[6] 74 Stat. 86.

Bills were introduced in each House of the Congress, embodying the President's suggestion, one in the Senate being S. 1732[7] and one in the House, H. R. 7152. However, it was not until July 2, 1964, upon the recommendation of President Johnson, that the Civil Rights Act of 1964, here under attack, was finally passed.

After extended hearings each of these bills was favorably reported to its respective house, H. R. 7152 on November 20, 1963, H. R. Rep. No. 914, 88th Cong., 1st Sess., and S. 1732 on February 10, 1964, S. Rep. No. 872, 88th Cong., 2d Sess. Although each bill originally incorporated extensive findings of fact these were eliminated from the bills as they were reported. The House passed its bill in January 1964 and sent it to the Senate. Through a bipartisan coalition of Senators Humphrey and Dirksen, together with other Senators, a substitute was worked out in informal conferences. This substitute was adopted by the Senate and sent to the House where it was adopted without change. This expedited procedure prevented the usual report on the substitute bill in the Senate as well as a Conference Committee report ordinarily filed in such matters. Our only frame of reference as to the legislative history of the Act is, therefore, the hearings, reports and debates on the respective bills in each house.

The Act as finally adopted was most comprehensive, undertaking to prevent through peaceful and voluntary settlement discrimination in voting, as well as in places of accommodation and public facilities, federally secured programs and in employment. Since Title II is the only portion under attack here, we confine our consideration to those public accommodation provisions.

---

[7] S. 1732 dealt solely with public accommodations. A second Senate bill, S. 1731, contained the entire administration proposal. The Senate Judiciary Committee conducted the hearings on S. 1731 while the Committee on Commerce considered S. 1732.

### 3. *Title II of the Act.*

This Title is divided into seven sections beginning with § 201 (a) which provides that:

"All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."

There are listed in § 201 (b) four classes of business establishments, each of which "serves the public" and "is a place of public accommodation" within the meaning of § 201 (a) "if its operations affect commerce, or if discrimination or segregation by it is supported by State action." The covered establishments are:

"(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

"(2) any restaurant, cafeteria . . . [not here involved];

"(3) any motion picture house . . . [not here involved];

"(4) any establishment . . . which is physically located within the premises of any establishment otherwise covered by this subsection, or . . . within the premises of which is physically located any such covered establishment . . . . [not here involved]."

Section 201 (c) defines the phrase "affect commerce" as applied to the above establishments. It first declares that "any inn, hotel, motel, or other establishment which provides lodging to transient guests" affects commerce *per se.* Restaurants, cafeterias, etc., in class two affect

commerce only if they serve or offer to serve interstate travelers or if a substantial portion of the food which they serve or products which they sell have "moved in commerce." Motion picture houses and other places listed in class three affect commerce if they customarily present films, performances, etc., "which move in commerce." And the establishments listed in class four affect commerce if they are within, or include within their own premises, an establishment "the operations of which affect commerce." Private clubs are excepted under certain conditions. See § 201 (e).

Section 201 (d) declares that "discrimination or segregation" is supported by state action when carried on under color of any law, statute, ordinance, regulation or any custom or usage required or enforced by officials of the State or any of its subdivisions.

In addition, § 202 affirmatively declares that all persons "shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof."

Finally, § 203 prohibits the withholding or denial, etc., of any right or privilege secured by § 201 and § 202 or the intimidation, threatening or coercion of any person with the purpose of interfering with any such right or the punishing, etc., of any person for exercising or attempting to exercise any such right.

The remaining sections of the Title are remedial ones for violations of any of the previous sections. Remedies are limited to civil actions for preventive relief. The Attorney General may bring suit where he has "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to

the full enjoyment of any of the rights secured by this title, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described . . . ." § 206 (a)..

A person aggrieved may bring suit, in which the Attorney General may be permitted to intervene. Thirty days' written notice before filing any such action must be given to the appropriate authorities of a State or subdivision the law of which prohibits the act complained of and which has established an authority which may grant relief therefrom. § 204 (c). In States where such condition does not exist the court after a case is filed may refer it to the Community Relations Service which is established under Title X of the Act. § 204 (d). This Title establishes such service in the Department of Commerce, provides for a Director to be appointed by the President with the advice and consent of the Senate and grants it certain powers, including the power to hold hearings, with reference to matters coming to its attention by reference from the court or between communities and persons involved in disputes arising under the Act.

4. *Application of Title II to Heart of Atlanta Motel.*

It is admitted that the operation of the motel brings it within the provisions of § 201 (a) of the Act and that appellant refused to provide lodging for transient Negroes because of their race or color and that it intends to continue that policy unless restrained.

The sole question posed is, therefore, the constitutionality of the Civil Rights Act of 1964 as applied to these facts. The legislative history of the Act indicates that Congress based the Act on § 5 and the Equal Protection Clause of the Fourteenth Amendment as well as its power to regulate interstate commerce under Art. I, § 8, cl. 3, of the Constitution.

The Senate Commerce Committee made it quite clear that the fundamental object of Title II was to vindicate "the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." At the same time, however, it noted that such an objective has been and could be readily achieved "by congressional action based on the commerce power of the Constitution." S. Rep. No. 872, *supra*, at 16–17. Our study of the legislative record, made in the light of prior cases, has brought us to the conclusion that Congress possessed ample power in this regard, and we have therefore not considered the other grounds relied upon. This is not to say that the remaining authority upon which it acted was not adequate, a question upon which we do not pass, but merely that since the commerce power is sufficient for our decision here we have considered it alone. Nor is § 201 (d) or § 202, having to do with state action, involved here and we do not pass upon either of those sections.

5. *The Civil Rights Cases, 109 U. S. 3 (1883), and their Application.*

In light of our ground for decision, it might be well at the outset to discuss the *Civil Rights Cases, supra,* which declared provisions of the Civil Rights Act of 1875 unconstitutional. 18 Stat. 335, 336. We think that decision inapposite, and without precedential value in determining the constitutionality of the present Act. Unlike Title II of the present legislation, the 1875 Act broadly proscribed discrimination in "inns, public conveyances on land or water, theaters, and other places of public amusement," without limiting the categories of affected businesses to those impinging upon interstate commerce. In contrast, the applicability of Title II is carefully limited to enterprises having a direct and substantial relation to the interstate flow of goods and peo-

ple, except where state action is involved. Further, the fact that certain kinds of businesses may not in 1875 have been sufficiently involved in interstate commerce to warrant bringing them within the ambit of the commerce power is not necessarily dispositive of the same question today. Our populace had not reached its present mobility, nor were facilities, goods and services circulating as readily in interstate commerce as they are today. Although the principles which we apply today are those first formulated by Chief Justice Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), the conditions of transportation and commerce have changed dramatically, and we must apply those principles to the present state of commerce. The sheer increase in volume of interstate traffic alone would give discriminatory practices which inhibit travel a far larger impact upon the Nation's commerce than such practices had on the economy of another day. Finally, there is language in the *Civil Rights Cases* which indicates that the Court did not fully consider whether the 1875 Act could be sustained as an exercise of the commerce power. Though the Court observed that "no one will contend that the power to pass it was contained in the Constitution before the adoption of the last three amendments [Thirteenth, Fourteenth, and Fifteenth]," the Court went on specifically to note that the Act was not "conceived" in terms of the commerce power, and expressly pointed out:

> "Of course, these remarks [as to lack of congressional power] do not apply to those cases in which Congress is clothed with direct and plenary powers of legislation over the whole subject, accompanied with an express or implied denial of such power to the States, as in the regulation of commerce with foreign nations, among the several States, and with the Indian tribes . . . . In these cases Congress has

power to pass laws for regulating the subjects specified in every detail, and the conduct and transactions of individuals in respect thereof." At 18.

Since the commerce power was not relied on by the Government and was without support in the record it is understandable that the Court narrowed its inquiry and excluded the Commerce Clause as a possible source of power. In any event, it is clear that such a limitation renders the opinion devoid of authority for the proposition that the Commerce Clause gives no power to Congress to regulate discriminatory practices now found substantially to affect interstate commerce. We, therefore, conclude that the *Civil Rights Cases* have no relevance to the basis of decision here where the Act explicitly relies upon the commerce power, and where the record is filled with testimony of obstructions and restraints resulting from the discriminations found to be existing. We now pass to that phase of the case.

### 6. *The Basis of Congressional Action.*

While the Act as aaopted carried no congressional findings the record of its passage through each house is replete with evidence of the burdens that discrimination by race or color places upon interstate commerce. See Hearings before Senate Committee on Commerce on S. 1732, 88th Cong., 1st Sess.; S. Rep. No. 872, *supra*; Hearings before Senate Committee on the Judiciary on S. 1731, 88th Cong., 1st Sess.; Hearings before House Subcommittee No. 5 of the Committee on the Judiciary on miscellaneous proposals regarding Civil Rights, 88th Cong., 1st Sess., ser. 4; H. R. Rep. No. 914, *supra*. This testimony included the fact that our people have become increasingly mobile with millions of people of all races traveling from State to State; that Negroes in particular have been the subject of discrimination in transient accommodations, having to travel great dis-

tances to secure the same; that often they have been unable to obtain accommodations and have had to call upon friends to put them up overnight, S. Rep. No. 872, *supra,* at 14–22; and that these conditions had become so acute as to require the listing of available lodging for Negroes in a special guidebook which was itself "dramatic testimony to the difficulties" Negroes encounter in travel. Senate Commerce Committee Hearings, *supra,* at 692–694. These exclusionary practices were found to be nationwide, the Under Secretary of Commerce testifying that there is "no question that this discrimination in the North still exists to a large degree" and in the West and Midwest as well. *Id.,* at 735, 744. This testimony indicated a qualitative as well as quantitative effect on interstate travel by Negroes. The former was the obvious impairment of the Negro traveler's pleasure and convenience that resulted when he continually was uncertain of finding lodging. As for the latter, there was evidence that this uncertainty stemming from racial discrimination had the effect of discouraging travel on the part of a substantial portion of the Negro community. *Id.,* at 744. This was the conclusion not only of the Under Secretary of Commerce but also of the Administrator of the Federal Aviation Agency who wrote the Chairman of the Senate Commerce Committee that it was his "belief that air commerce is adversely affected by the denial to a substantial segment of the traveling public of adequate and desegregated public accommodations." *Id.,* at 12–13. We shall not burden this opinion with further details since the voluminous testimony presents overwhelming evidence that discrimination by hotels and motels impedes interstate travel.

7. *The Power of Congress Over Interstate Travel.*

The power of Congress to deal with these obstructions depends on the meaning of the Commerce Clause. Its meaning was first enunciated 140 years ago by the great

Chief Justice John Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), in these words:

> "The subject to be regulated is commerce; and . . . to ascertain the extent of the power, it becomes necessary to settle the meaning of the word. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities . . . but it is something more: it is intercourse . . . between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse. [At 189–190.]

> .        .        .        .        .

> "To what commerce does this power extend? The constitution informs us, to commerce 'with foreign nations, and among the several States, and with the Indian tribes.'
>
> "It has, we believe, been universally admitted, that these words comprehend every species of commercial intercourse . . . . No sort of trade can be carried on . . . to which this power does not extend. [At 193–194.]

> .        .        .        .        .

> "The subject to which the power is next applied, is to commerce 'among the several States.' The word 'among' means intermingled . . . .

> .        .        .        .        .

> ". . . [I]t may very properly be restricted to that commerce which concerns more States than one. . . . The genius and character of the whole government seem to be, that its action is to be applied to all the . . . internal concerns [of the Nation] which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not neces-

sary to interfere, for the purpose of executing some of the general powers of the government. [At 194–195.]

.    .    .    .    .

"We are now arrived at the inquiry—What is this power?

"It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution. ·. . . If, as has always been understood, the sovereignty of Congress . . . is. plenary as to those objects [specified in the Constitution], the power over commerce . . . is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints' on which the people must often rely solely, in all representative governments. [At 196–197.]"

In short, the determinative test of the exercise of power by the Congress under the Commerce Clause is simply whether the activity sought to be regulated is "commerce which concerns more States than one" and has a real and substantial relation to the national interest. Let us now turn to this facet of the problem.

That the "intercourse" of which the Chief Justice spoke included the movement of persons through more

States than one was settled as early as 1849, in the *Passenger Cases,* 7 How. 283, where Mr. Justice McLean stated: "That the transportation of passengers is a part of commerce is not now an open question." At 401. Again in 1913 Mr. Justice McKenna, speaking for the Court, said: "Commerce among the States, we have said, consists of intercourse and traffic between their citizens, and includes the transportation of persons and property." *Hoke v. United States,* 227 U. S. 308, 320. And only four years later in 1917 in *Caminetti* v. *United States,* 242 U. S. 470, Mr. Justice Day held for the Court:

> "The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question." At 491.

Nor does it make any difference whether the transportation is commercial in character. *Id.,* at 484–486. In *Morgan* v. *Virginia,* 328 U. S. 373 (1946), Mr. Justice Reed observed as to the modern movement of persons among the States:

> "The recent changes in transportation brought about by the coming of automobiles [do] not seem of great significance in the problem. People of all races travel today more extensively than in 1878 when this Court first passed upon state regulation of racial segregation in commerce. [It but] emphasizes the soundness of this Court's early conclusion in *Hall* v. *DeCuir,* 95 U. S. 485." At 383.

The same interest in protecting interstate commerce which led Congress to deal with segregation in interstate

carriers and the white-slave traffic has prompted it to extend the exercise of its power to gambling, *Lottery Case,* 188 U. S. 321 (1903); to criminal enterprises, *Brooks* v. *United States,* 267 U. S. 432 (1925); to deceptive practices in the sale of products, *Federal Trade Comm'n* v. *Mandel Bros., Inc.,* 359 U. S. 385 (1959); to fraudulent security transactions, *Securities & Exchange Comm'n* v. *Ralston Purina Co.,* 346 U. S. 119 (1953); to misbranding of drugs, *Weeks* v. *United States,* 245 U. S. 618 (1918); to wages and hours, *United States* v. *Darby,* 312 U. S. 100 (1941); to members of labor unions, *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937); to crop control, *Wickard* v. *Filburn,* 317 U. S. 111 (1942); to discrimination against shippers, *United States* v. *Baltimore & Ohio R. Co.,* 333 U. S. 169 (1948); to the protection of small business from injurious price cutting, *Moore* v. *Mead's Fine Bread Co.,* 348 U. S. 115 (1954); to resale price maintenance, *Hudson Distributors, Inc.* v. *Eli Lilly & Co.,* 377 U. S. 386 (1964), *Schwegmann* v. *Calvert Distillers Corp.,* 341 U. S. 384 (1951); to professional football, *Radovich* v. *National Football League,* 352 U. S. 445 (1957); and to racial discrimination by owners and managers of terminal restaurants, *Boynton* v. *Virginia,* 364 U. S. 454 (1960).

That Congress was legislating against moral wrongs in many of these areas rendered its enactments no less valid. In framing Title II of this Act Congress was also dealing with what it considered a moral problem. But that fact does not detract from the overwhelming evidence of the disruptive effect that racial discrimination has had on commercial intercourse. It was this burden which empowered Congress to enact appropriate legislation, and, given this basis for the exercise of its power, Congress was not restricted by the fact that the particular obstruction to interstate commerce with which it was dealing was also deemed a moral and social wrong.

It is said that the operation of the motel here is of a purely local character. But, assuming this to be true, "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States* v. *Women's Sportswear Mfrs. Assn.,* 336 U. S. 460, 464 (1949). See *Labor Board* v. *Jones & Laughlin Steel Corp., supra.* As Chief Justice Stone put it in *United States* v. *Darby, supra:*

> "The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce. See *McCulloch* v. *Maryland,* 4 Wheat. 316, 421." At 118.

Thus the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce. One need only examine the evidence which we have discussed above to see that Congress may—as it has—prohibit racial discrimination by motels serving travelers, however "local" their operations may appear.

Nor does the Act deprive appellant of liberty or property under the Fifth Amendment. The commerce power invoked here by the Congress is a specific and plenary one authorized by the Constitution itself. The only questions are: (1) whether Congress had a rational basis for finding that racial discrimination by motels affected commerce, and (2) if it had such a basis, whether the means it selected to eliminate that evil are reasonable and appro-

priate. If they are, appellant has no "right" to select its guests as it sees fit, free from governmental regulation.

There is nothing novel about such legislation. Thirty-two States [8] now have it on their books either by statute or executive order and many cities provide such regulation. Some of these Acts go back fourscore years. It has been repeatedly held by this Court that such laws

---

[8] The following statutes indicate States which have enacted public accommodation laws:

Alaska Stat., §§ 11.60.230 to 11.60.240 (1962); Cal. Civil Code, §§ 51 to 54 (1954); Colo. Rev. Stat. Ann., §§ 25-1-1 to 25-2-5 (1953); Conn. Gen. Stat. Ann., § 53-35 (1963 Supp.); Del. Code Ann., Tit. 6, c. 45 (1963); Idaho Code Ann., §§ 18-7301 to 18-7303 (1963 Supp.); Ill. Ann. Stat. (Smith-Hurd ed.), c. 38, §§ 13-1 to 13-4 (1964), c. 43, § 133 (1944); Ind. Ann. Stat. (Burns ed.), §§ 10-901 to 10-914 (1956, and 1963 Supp.); Iowa Code Ann., §§ 735.1 and 735.2 (1950); Kan. Gen. Stat. Ann., § 21-2424 (1961 Supp.); Me. Rev. Stat. Ann., c. 137, § 50 (1954); Md. Ann. Code, Art. 49B, § 11 (1964); Mass. Ann. Laws, c. 140, §§ 5 and 8 (1957), c. 272, §§ 92A and 98 (1963 Supp.); Mich. Stat. Ann., §§ 28.343 and 28.344 (1962); Minn. Stat. Ann., § 327.09 (1947); Mont. Rev. Codes Ann., § 64-211 (1962); Neb. Rev. Stat., §§ 20-101 and 20-102 (1962); N. H. Rev. Stat. Ann., §§ 354:1, 354:2, 354:4 and 354:5 (1955, and 1963 Supp.); N. J. Stat. Ann., §§ 10:1-2 to 10:1-7 (1960), §§ 18:25-1 to 18:25-6 (1964 Supp.); N. M. Stat. Ann., §§ 49-8-1 to 49-8-7 (1963 Supp.); N. Y. Civil Rights Law (McKinney ed.), Art. 4, §§ 40 and 41 (1948, and 1964 Supp.), Exec. Law, Art. 15, §§ 290 to 301 (1951, and 1964 Supp.), Penal Law, Art. 46, §§ 513 to 515 (1944); N. D. Cent. Code, § 12-22-30 (1963 Supp.); Ohio Rev. Code Ann. (Page's ed.), §§ 2901.35 and 2901.36 (1954); Ore. Rev. Stat., §§ 30.670, 30.675 and 30.680 (1963); Pa. Stat. Ann., Tit. 18, § 4654 (1963); R. I. Gen. Laws Ann., §§ 11-24-1 to 11-24-6 (1956); S. Dak. Sess. Laws, c. 58 (1963); Vt. Stat. Ann., Tit. 13, §§ 1451 and 1452 (1958); Wash. Rev. Code, §§ 49.60.010 to 49.60.170, and § 9.91.010; Wis. Stat. Ann., § 942.04 (1958); Wyo. Stat. Ann., §§ 6-83.1 and 6-83.2 (1963 Supp.).

In 1963 the Governor of Kentucky issued an executive order requiring all governmental agencies involved in the supervision or licensing of businesses to take all lawful action necessary to prevent racial discrimination.

do not violate the Due Process Clause of the Fourteenth Amendment. Perhaps the first such holding was in the *Civil Rights Cases* themselves, where Mr. Justice Bradley for the Court inferentially found that innkeepers, "by the laws of all the States, so far as we are aware, are bound, to the extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them." At 25.

As we have pointed out, 32 States now have such provisions and no case has been cited to us where the attack on a state statute has been successful, either in federal or state courts. Indeed, in some cases the Due Process and Equal Protection Clause objections have been specifically discarded in this Court. *Bob-Lo Excursion Co.* v. *Michigan,* 333 U. S. 28, 34, n. 12 (1948). As a result the constitutionality of such state statutes stands unquestioned. "The authority of the Federal Government over interstate commerce does not differ," it was held in *United States* v. *Rock Royal Co-op., Inc.,* 307 U. S. 533 (1939), "in extent or character from that retained by the states over intrastate commerce." At 569–570. See also *Bowles* v. *Willingham,* 321 U. S. 503 (1944).

It is doubtful if in the long run appellant will suffer economic loss as a result of the Act. Experience is to the contrary where discrimination is completely obliterated as to all public accommodations. But whether this be true or not is of no consequence since this Court has specifically held that the fact that a "member of the class which is regulated may suffer economic losses not shared by others . . . has never been a barrier" to such legislation. *Bowles* v. *Willingham, supra,* at 518. Likewise in a long line of cases this Court has rejected the claim that the prohibition of racial discrimination in public accommodations interferes with personal liberty. See *District of Columbia* v. *John R. Thompson Co.,* 346 U. S.

100 (1953), and cases there cited, where we concluded that Congress had delegated law-making po.:·er to the District of Columbia "as broad as the police power of a state" which included the power to adopt "a law prohibiting discriminations against Negroes by the owners and managers of restaurants in the District of Columbia." At 110. Neither do we find any merit in the claim that the Act is a taking of property without just compensation. The cases are to the contrary. See *Legal Tender Cases,* 12 Wall. 457, 551 (1870); *Omnia Commercial Co. v. United States,* 261 U. S. 502 (1923); *United States v. Central Eureka Mining Co.,* 357 U. S. 155 (1958).

We find no merit in the remainder of appellant's contentions, including that of "involuntary servitude." As we have seen, 32 States prohibit racial discrimination in public accommodations. These laws but codify the common-law innkeeper rule which long predated the Thirteenth Amendment. It is difficult to believe that the Amendment was intended to abrogate this principle. Indeed, the opinion of the Court in the *Civil Rights Cases* is to the contrary as we have seen, it having noted with approval the laws of "all the States" prohibiting discrimination. We could not say that the requirements of the Act in this regard are in any way "akin to African slavery." *Butler v. Perry,* 240 U. S. 328, 332 (1916).

We, therefore, conclude that the action of the Congress in the adoption of the Act as applied here to a motel which concededly serves interstate travelers is within the power granted it by the Commerce Clause of the Constitution, as interpreted by this Court for 140 years. It may be argued that Congress could have pursued other methods to eliminate the obstructions it found in interstate commerce caused by racial discrimination. But this is a matter of policy that rests entirely with the Congress not with the courts. How obstructions in commerce

may be removed—what means are to be employed—is within the sound and exclusive discretion of the Congress. It is subject only to one caveat—that the means chosen .by it must be reasonably adapted to the end permitted by the Constitution. We cannot say that its choice here was not so adapted. The Constitution requires no more.

*Affirmed.*

## APPENDIX TO OPINION OF THE COURT.

"TITLE II—INJUNCTIVE RELIEF AGAINST DISCRIMINATION IN PLACES OF PUBLIC AC-COMMODATION

"SEC. 201. (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce, or if discrimination or segregation by it is supported by State action :

"(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such. facility located on the premises of any retail establishment; or any gasoline station;

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

"(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

"(c) The operations of an establishment affect commerce within the meaning of this title if (1) it is one of the establishments described in paragraph (1) of subsection (b); (2) in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce; (3) in the case of an establishment described in paragraph (3) of subsection (b), it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; and (4) in the case of an establishment described in paragraph (4) of subsection (b), it is physically located within the premises of, or there is physically located within its premises, an establishment the operations of which affect commerce within the meaning of this subsection. For purposes of this section, 'commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

"(d) Discrimination or segregation is supported by State action with title if such discrimination or s

on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof.

"(e) The provisions of this title shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b).

"SEC. 202. All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof.

"SEC. 203. No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 201 or 202, or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by section 201 or 202, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 201 or 202.

"SEC. 204. (a) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 203, a civil action for preventive relief, including an application for a permanent or temporary injunction, ____ing order, or other order, may be instituted by the ____ and, upon timely application, the court ____ permit the Attorney General to ____tion if he certifies that the case

is of general public importance. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs, or security.

"(b) In any action commenced pursuant to this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person.

"(c) In the case of an alleged act or practice prohibited by this title which occurs in a State, or political subdivision of a State, which has a State or local law prohibiting such act or practice and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no civil action may be brought under subsection (a) before the expiration of thirty days after written notice of such alleged act or practice has been given to the appropriate State or local authority by registered mail or in person, provided that the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings.

"(d) In the case of an alleged act or practice prohibited by this title which occurs in a State, or political subdivision of a State, which has no State or local law prohibiting such act or practice, a civil action may be brought under subsection (a): *Provided,* That the court may refer the matter to the Community Relations Service established by title X of this Act for as long as the court believes there is a reasonable possibility of obtaining voluntary compliance, but for not more than sixty days: *Provided further,* That upon expiration of such sixty-day period, the court may extend such period for an addi-

tional period, not to exceed a cumulative total of one hundred and twenty days, if it believes there then exists a reasonable possibility of securing voluntary compliance.

"SEC. 205. The Service is authorized to make a full investigation of any complaint referred to it by the court under section 204 (d) and may hold such hearings with respect thereto as may be necessary. The Service shall conduct any hearings with respect to any such complaint in executive session, and shall not release any testimony given therein except by agreement of all parties involved in the complaint with the permission of the court, and the Service shall endeavor to bring about a voluntary settlement between the parties.

"SEC. 206. (a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this title, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

"(b) In any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate

and request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the case is pending. Upon receipt of the copy of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

"In the event the Attorney General fails to file such a request in any such proceeding, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

"It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

"SEC. 207. (a) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this title and shall exercise the same without regard

to whether the aggrieved party shall have exhausted any administrative or other remedies that may be provided by law.

"(b) The remedies provided in this title shall be the exclusive means of enforcing the rights based on this title, but nothing in this title shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law not inconsistent with this title, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right."

MR. JUSTICE BLACK, concurring.[*]

In the first of these two cases the Heart of Atlanta Motel, a large motel in downtown Atlanta, Georgia, appeals from an order of a three-judge United States District Court for the Northern District of Georgia enjoining it from continuing to violate Title II of the Civil Rights Act of 1964[1] by refusing to accept Negroes as lodgers solely because of their race. In the second case the Acting Attorney General of the United States and a United States Attorney appeal from a judgment of a three-judge United States District Court for the Northern District of Alabama holding that Title II cannot constitutionally be applied to Ollie's Barbecue, a restaurant in Birmingham, Alabama, which serves few if any interstate travelers but which buys a substantial quantity of food which has moved in interstate commerce. It is undisputed that both establishments had and intended to continue a policy against serving Negroes. Both claimed that Con-

---

[*][This opinion applies also to No. 543, *Katzenbach* v. *McClung, post*, p. 294.]

[1] 78 Stat. 243–246, 42 U. S. C. §§ 2000a—2000a-6 (1964 ed.).

gress had exceeded its constitutional powers in attempting to compel them to use their privately owned businesses to serve customers whom they did not want to serve.

The most immediately relevant parts of Title II of the Act, which, if valid, subject this motel and this restaurant to its requirements are set out below.[2] The language of that Title shows that Congress in passing it intended to exercise—at least in part—power granted in the Constitu-

---

[2] Section 201 of the Act, 78 Stat. 243, 42 U. S. C. § 2000a (1964 ed.), provides in part:

"(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

"(1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

"(2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

"(c) The operations of an establishment affect commerce within the meaning of this title if (1) it is one of the establishments described in paragraph (1) of subsection (b); (2) in the case of an establishment described in paragraph (2) of subsection (b), it serves or offers to serve interstate travelers or a substantial portion of the food which it serves, or gasoline or other products which it sells, has moved in commerce . . . . For purposes of this section, 'commerce' means travel, trade, traffic, commerce, transportation, or communication among the several States . . . ."

tion by Art. I, § 8, "To regulate Commerce . . . among the several States . . . ." Thus § 201 (b) of Title II by its terms is limited in application to a motel or restaurant of which the "operations affect [interstate] commerce, or if discrimination or segregation by it is supported by State action."[3] The "State action" provision need not concern us here since there is no contention that Georgia or Alabama has at this time given any support whatever to these establishments' racially discriminatory practices. The basic constitutional question decided by the courts below and which this Court must now decide is whether Congress exceeded its powers to regulate interstate commerce and pass all laws necessary and proper to such regulation in subjecting either this motel or this restaurant to Title II's commands that applicants for food and lodging be served without regard to their color. And if the regulation is otherwise within the congressional commerce power, the motel and the restaurant proprietors further contend that it would be a denial of due process under the Fifth Amendment to compel them to serve Negroes against their will.[4] I agree that all these constitutional contentions must be rejected.

## I.

It requires no novel or strained interpretation of the Commerce Clause to sustain Title II as applied in either

---

[3] This last definitional clause of § 201 (b) together with § 202 shows a congressional purpose also to rely in part on § 1 of the Fourteenth Amendment, which forbids any State to deny due process or equal protection of the laws. There is no contention in these cases that Congress relied on the fifth section of the Fourteenth Amendment granting it "power to enforce, by appropriate legislation, the provisions of" the Amendment.

[4] The motel also argues that the law violates the Thirteenth Amendment's prohibition of slavery or involuntary servitude and takes private property for public use without just compensation, in violation of the Fifth Amendment.

of these cases. At least since *Gibbons* v. *Ogden,* 9 Wheat. 1, decided in 1824 in an opinion by Chief Justice John Marshall, it has been uniformly accepted that the power of Congress to regulate commerce among the States is plenary, "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." 9 Wheat., at 196. Nor is "Commerce" as used in the Commerce Clause to be limited to a narrow, technical concept. It includes not only, as Congress has enumerated in the Act, "travel, trade, traffic, commerce, transportation, or communication," but also all other unitary transactions and activities that take place in more States than one. That some parts or segments of such unitary transactions may take place only in one State cannot, of course, take from Congress its plenary power to regulate them in the national interest.[5] The facilities and instrumentalities used to carry on this commerce, such as railroads, truck lines, ships, rivers, and even highways are also subject to congressional regulation, so far as is necessary to keep interstate traffic upon fair and equal terms. *The Daniel Ball,* 10 Wall. 557.

Furthermore, it has long been held that the Necessary and Proper Clause, Art. I, § 8, cl. 18, adds to the commerce power of Congress the power to regulate local instrumentalities operating within a single State if their activities burden the flow of commerce among the States. Thus in the *Shreveport Case, Houston, E. & W. T. R. Co.* v. *United States,* 234 U. S. 342, 353–354, this Court recognized that Congress could not fully carry out its responsibility to protect interstate commerce were its constitutional power to regulate that commerce to be strictly limited to prescribing the rules for controlling the things

---

[5] Compare *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 546–547; *Board of Trade* v. *Olsen,* 262 U. S. 1, 33–36; *Swift & Co.* v. *United States,* 196 U. S. 375, 398–399.

actually moving in such commerce or the contracts, transactions, and other activities, immediately concerning them. Regulation of purely intrastate railroad rates is primarily a local problem for state rather than national control. But the *Shreveport Case* sustained the power of Congress under the Commerce Clause and the Necessary and Proper Clause to control purely intrastate rates, even though reasonable, where the effect of such rates was found to impose a discrimination injurious to interstate commerce. This holding that Congress had power under these clauses, not merely to enact laws governing interstate activities and transactions, but also to regulate even purely local activities and transactions where necessary to foster and protect interstate commerce, was amply supported by Mr. Justice (later Mr. Chief Justice) Hughes' reliance upon many prior holdings of this Court extending back to *Gibbons* v. *Ogden, supra.*[6] And since the *Shreveport Case* this Court has steadfastly followed, and indeed has emphasized time and time again, that Congress has ample power to protect interstate commerce from activities adversely and injuriously affecting it, which but for this adverse effect on interstate commerce would be beyond the power of Congress to regulate.[7]

---

[6] "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, *which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government." Gibbons* v. *Ogden, supra,* 9 Wheat., at 195. (Emphasis supplied.)

[7] See, *e. g., Labor Board* v. *Reliance Fuel Oil Corp.,* 371 U. S. 224; *Lorain Journal Co.* v. *United States,* 342 U. S. 143; *United States* v. *Women's Sportswear Manufacturers Assn.,* 336 U. S. 460; *United States* v. *Sullivan,* 332 U. S. 689; *Wickard* v. *Filburn,* 317 U. S. 111; *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110; *United States* v. *Darby,* 312 U. S. 100; *Labor Board* v. *Jones & Laughlin Steel*

Congress in § 201 declared that the racially discriminatory "operations" of a motel of more than five rooms for rent or hire do adversely affect interstate commerce if it "provides lodging to transient guests . . ." and that a restaurant's "operations" affect such commerce if (1) "it serves or offers to serve interstate travelers" or (2) "a substantial portion of the food which it serves . . . has moved in [interstate] commerce." Congress thus described the nature and extent of operations which it wished to regulate, excluding some establishments from the Act either for reasons of policy or because it believed its powers to regulate and protect interstate commerce did not extend so far. There can be no doubt that the operations of both the motel and the restaurant here fall squarely within the measure Congress chose to adopt in the Act and deemed adequate to show a constitutionally prohibitable adverse effect on commerce. The choice of policy is of course within the exclusive power of Congress; but whether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court. I agree that as applied to this motel and this restaurant the Act is a valid exercise of congressional power, in the case of the motel because the record amply demonstrates that its practice of discrimination tended directly to interfere with interstate travel, and in the case of the restaurant because Congress had ample basis for concluding that a widespread practice of racial discrimination by restaurants buying as substantial a quantity of goods shipped from other States as this restaurant buys could distort or impede interstate trade.

Corp., 301 U. S. 1; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334. See also *Southern R. Co.* v. *United States,* 222 U. S. 20.

The Heart of Atlanta Motel is a large 216-room establishment strategically located in relation to Atlanta and interstate travelers. It advertises extensively by signs along interstate highways and in various advertising media. As a result of these circumstances approximately 75% of the motel guests are transient interstate travelers. It is thus an important facility for use by interstate travelers who travel on highways, since travelers in their own cars must find lodging places to make their journeys comfortably and safely.

The restaurant is located in a residential and industrial section of Birmingham, 11 blocks from the nearest interstate highway. Almost all, if not all, its patrons are local people rather than transients. It has seats for about 200 customers and annual gross sales of about $350,000. Most of its sales are of barbecued meat sandwiches and pies. Consequently, the main commodity it purchases is meat, of which during the 12 months before the District Court hearing it bought $69,683 worth (representing 46% of its total expenditures for supplies), which had been shipped into Alabama from outside the State. Plainly, 46% of the goods it sells is a "substantial" portion and amount. Congress concluded that restaurants which purchase a substantial quantity of goods from other States might well burden and disrupt the flow of interstate commerce if allowed to practice racial discrimination, because of the stifling and distorting effect that such discrimination on a wide scale might well have on the sale of goods shipped across state lines. Certainly this belief would not be irrational even had there not been a large body of evidence before the Congress to show the probability of this adverse effect.[8]

_____

[8] See, e. g., Hearings Before the Senate Committee on Commerce on S. 1732, 88th Cong., 1st Sess., Part 1, Ser. 26, pp. 18–19 (Attorney General Kennedy), 623–630 (Secretary of Labor Wirtz); Part 2, Ser. 26, pp. 695–700 (Under Secretary of Commerce Roosevelt).

The foregoing facts are more than enough, in my judgment, to show that Congress acting within its discretion and judgment has power under the Commerce Clause and the Necessary and Proper Clause to bar racial discrimination in the Heart of Atlanta Motel and Ollie's Barbecue. I recognize that every remote, possible, speculative effect on commerce should not be accepted as an adequate constitutional ground to uproot and throw into the discard all our traditional distinctions between what is purely local, and therefore controlled by state laws, and what affects the national interest and is therefore subject to control by federal laws. I recognize too that some isolated and remote lunchroom which sells only to local people and buys almost all its supplies in the locality may possibly be beyond the reach of the power of Congress to regulate commerce, just as such an establishment is not covered by the present Act. But in deciding the constitutional power of Congress in cases like the two before us we do not consider the effect on interstate commerce of only one isolated, individual, local event, without regard to the fact that this single local event when added to many others of a similar nature may impose a burden on interstate commerce by reducing its volume or distorting its flow. *Labor Board* v. *Reliance Fuel Oil Corp.*, 371 U. S. 224; *Wickard* v. *Filburn*, 317 U. S. 111, 127–128; *United States* v. *Darby*, 312 U. S. 100, 123; *Labor Board* v. *Fainblatt*, 306 U. S. 601, 608–609; cf. *Hotel Employees Local No. 255* v. *Leedom*, 358 U. S. 99. There are approximately 20,000,000 Negroes in our country.[9] Many of them are able to, and do, travel among the States in automobiles. Certainly it would seriously discourage such travel by them if, as evidence before the Congress indicated has been true in the past,[10] they should in the

---

[9] Bureau of the Census, 1964 Statistical Abstract of the United States, 25 (18,872,000 Negroes by 1960 census).

[10] See, *e. g.*, S. Rep. No. 872, 88th Cong., 2d Sess., 15–18.

future continue to be unable to find a decent place along their way in which to lodge or eat. Cf. *Boynton* v. *Virginia,* 364 U. S. 454. And the flow of interstate commerce may be impeded or distorted substantially if local sellers of interstate food are permitted to exclude all Negro consumers. Measuring, as this Court has so often held is required, by the aggregate effect of a great number of such acts of discrimination, I am of the opinion that Congress has constitutional power under the Commerce and Necessary and Proper Clauses to protect interstate commerce from the injuries bound to befall it from these discriminatory practices.

Long ago this Court, again speaking through Mr. Chief Justice Marshall, said:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *M'Culloch* v. *Maryland,* 4 Wheat. 316, 421.

By this standard Congress acted within its power here. In view of the Commerce Clause it is not possible to deny that the aim of protecting interstate commerce from undue burdens is a legitimate end. In view of the Thirteenth, Fourteenth and Fifteenth Amendments, it is not possible to deny that the aim of protecting Negroes from discrimination is also a legitimate end.[11] The means

[11] We have specifically upheld the power of Congress to use the commerce power to end racial discrimination. *Boynton* v. *Virginia,* 364 U. S. 454; *Henderson* v. *United States,* 339 U. S. 816; *Mitchell* v. *United States,* 313 U. S. 80; cf. *Bailey* v. *Patterson,* 369 U. S. 31; *Morgan* v. *Virginia,* 328 U. S. 373. Compare cases in which the commerce power has been used to advance other ends not entirely commercial: *e. g.,* *United States* v. *Darby,* 312 U. S. 100 (Fair Labor Standards Act); *United States* v. *Miller,* 307 U. S. 174 (National Firearms Act); *Gooch* v. *United States,* 297 U. S. 124 (Federal Kid-

adopted to achieve these ends are also appropriate, plainly adopted to achieve them and not prohibited by the Constitution but consistent with both its letter and spirit.

## II.

The restaurant and motel proprietors argue also, however, that Congress violated the Due Process Clause of the Fifth Amendment by requiring that they serve Negroes if they serve others. This argument comes down to this: that the broad power of Congress to enact laws deemed necessary and proper to regulate and protect interstate commerce is practically nullified by the negative constitutional commands that no person shall be deprived of "life, liberty, or property, without due process of law" and that private property shall not be "taken" for public use without just compensation. In the past this Court has consistently held that regulation of the use of property by the Federal Government or by the States does not violate either the Fifth or the Fourteenth Amendment. See, *e. g., Ferguson* v. *Skrupa,* 372 U. S. 726; *District of Columbia* v. *John R. Thompson Co.,* 346 U. S. 100; *Village of Euclid* v. *Ambler Realty Co.,* 272 U. S. 365; *Nebbia* v. *New York,* 291 U. S. 502. A regulation such as that found in Title II does not even come close to being a "taking" in the constitutional sense. Cf. *United States* v. *Central Eureka Mining Co.,* 357 U. S. 155. And a more or less vague clause like the requirement for due process, originally meaning "according to

naping Act); *Brooks* v. *United States,* 267 U. S. 432 (National Motor Vehicle Theft Act); *United States* v. *Simpson,* 252 U. S. 465 (Act forbidding shipment of liquor into a "dry" State); *Caminetti* v. *United States,* 242 U. S. 470 (White-Slave Traffic [Mann] Act); *Hoke* v. *United States,* 227 U. S. 308 (White-Slave Traffic [Mann] Act); *Hipolite Egg Co.* v. *United States,* 220 U. S. 45 (Pure Food and Drugs Act); *Lottery Case,* 188 U. S. 321 (Act forbidding interstate shipment of lottery tickets).

the law of the land" would be a highly inappropriate provision on which to rely to invalidate a "law of the land" enacted by Congress under a clearly granted power like that to regulate interstate commerce. Moreover, it would be highly ironical to use the guarantee of due process—a guarantee which plays so important a part in the Fourteenth Amendment, an amendment adopted with the predominant aim of protecting Negroes from discrimination—in order to strip Congress of power to protect Negroes from discrimination.[12]

## III.

For the foregoing reasons I concur in holding that the anti-racial-discrimination provisions of Title II of the Civil Rights Act of 1964 are valid as applied to this motel and this restaurant. I should add that nothing in the *Civil Rights Cases,* 109 U. S. 3, which invalidated the Civil Rights Act of 1875,[13] gives the slightest support to the argument that Congress is without power under the Commerce Clause to enact the present legislation, since in the *Civil Rights Cases* this Court expressly left undecided the validity of such antidiscrimination legislation if rested on the Commerce Clause. See 109 U. S., at 18–19; see also *Butts* v. *Merchants & Miners Transp. Co.,* 230 U. S. 126, 132. Nor does any view expressed in my dissenting opinion in *Bell* v. *Maryland,* 378 U. S. 226, 318, in which MR. JUSTICE HARLAN and MR. JUSTICE WHITE joined, affect this conclusion in the slightest, for that opinion stated only that the Fourteenth Amendment in and of itself, without implementation by a law passed by Congress, does not bar racial discrimination in privately owned places of business in the absence of state action. The opinion did not discuss the power of Congress under

---

[12] The motel's argument that Title II violates the Thirteenth Amendment is so insubstantial that it requires no further discussion.

[13] 18 Stat. 335.

the Commerce and Necessary and Proper Clauses or under section 5 of the Fourteenth Amendment to pass a law forbidding such discrimination. See 378 U. S., at 318, 326, 342–343 and n. 44. Because the Civil Rights Act of 1964 as applied here is wholly valid under the Commerce Clause and the Necessary and Proper Clause, there is no need to consider whether this Act is also constitutionally supportable under section 5 of the Fourteenth Amendment which grants Congress "power to enforce, by appropriate legislation, the provisions of this article."

MR. JUSTICE DOUGLAS, concurring.*

I.

Though I join the Court's opinions, I am somewhat reluctant here, as I was in *Edwards* v. *California,* 314 U. S. 160, 177, to rest solely on the Commerce Clause. My reluctance is not due to any conviction that Congress lacks power to regulate commerce in the interests of human rights. It is rather my belief that the right of people to be free of state action that discriminates against them because of race, like the "right of persons to move freely from State to State" (*Edwards* v. *California, supra,* at 177), "occupies a more protected position in our constitutional system than does the movement of cattle, fruit, steel and coal across state lines." *Ibid.* Moreover, when we come to the problem of abatement in *Hamm* v. *City of Rock Hill, post,* p. 306, decided this day, the result reached by the Court is for me much more obvious as a protective measure under the Fourteenth Amendment than under the Commerce Clause. For the former deals with the constitutional status of the individual not with the impact on commerce of local activities or vice versa.

---

*[This opinion applies also to No. 543, *Katzenbach* v. *McClung, post,* p. 294.]

Hence I would prefer to rest on the assertion of legislative power contained in § 5 of the Fourteenth Amendment which states: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article"—a power which the Court concedes was exercised at least in part in this Act.

A decision based on the Fourteenth Amendment would have a more settling effect, making unnecessary litigation over whether a particular restaurant or inn is within the commerce definitions of the Act or whether a particular customer is an interstate traveler. Under my construction, the Act would apply to all customers in all the enumerated places of public accommodation. And that construction would put an end to all obstructionist strategies and finally close one door on a bitter chapter in American history.

My opinion last Term in *Bell* v. *Maryland*, 378 U. S. 226, 242, makes clear my position that the right to be free of discriminatory treatment (based on race) in places of public accommodation—whether intrastate or interstate—is a right guaranteed against state action by the Fourteenth Amendment and that state enforcement of the kind of trespass laws which Maryland had in that case was state action within the meaning of the Amendment.

## II.

I think the Court is correct in concluding that the Act is not founded on the Commerce Clause to the exclusion of the Enforcement Clause of the Fourteenth Amendment.

In determining the reach of an exertion of legislative power, it is customary to read various granted powers together. See *Veazie Bank* v. *Fenno*, 8 Wall. 533, 548–549; *Edye* v. *Robertson*, 112 U. S. 580, 595–596; *United States* v. *Gettysburg Electric R. Co.*, 160 U. S. 668, 683. As stated in *McCulloch* v. *Maryland*, 4 Wheat. 316, 421:

"We admit, as all must admit, that the powers of the government are limited, and that its limits are

not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

The "means" used in the present Act are in my view "appropriate" and "plainly adapted" to the end of enforcing Fourteenth Amendment rights [1] as well as protecting interstate commerce.

Section 201 (a) declares in Fourteenth Amendment language the right of equal access:

"All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."

The rights protected are clearly within the purview of our decisions under the Equal Protection Clause of the Fourteenth Amendment.[2]

---

[1] For a synopsis of the legislative history see the Appendix to this opinion.

[2] See *Peterson* v. *City of Greenville*, 373 U. S. 244 (discrimination in restaurant); *Lombard* v. *Louisiana*, 373 U. S. 267 (discrimination in restaurant); *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (discrimination in restaurant); *Watson* v. *City of Memphis*, 373 U. S. 526 (discrimination in city park); *Brown* v. *Board of Education*, 347 U. S. 483 (discrimination in public school system); *Nixon* v. *Herndon*, 273 U. S. 536 (discrimination in voting).

"State action"—the key to Fourteenth Amendment
guarantees—is defined by § 201 (d) as follows:

> "Discrimination or segregation by an establish-
> ment is supported by State action within the mean-
> ing of this title if such discrimination or segregation
> (1) is carried on under color of any law, statute,
> ordinance, or regulation; or (2) is carried on under
> color of any custom or usage required or *enforced
> by officials of the State* or political subdivision
> thereof; or (3) is required by action of the State or
> political subdivision thereof." (Italics added.)

That definition is within our decision of *Shelley* v.
*Kraemer,* 334 U. S. 1, for the "discrimination" in the
present cases is "enforced by officials of the State," *i. e.,*
by the state judiciary under the trespass laws.[3] As we
wrote in *Shelley* v. *Kraemer, supra,* 19:

> "We have no doubt that there has been state action
> in these cases in the full and complete sense of the
> phrase. The undisputed facts disclose that peti-
> tioners were willing purchasers of properties upon
> which they desired to establish homes. The owners
> of the properties were willing sellers; and contracts
> of sale were accordingly consummated. It is clear
> that but for the active intervention of the state
> courts, supported by the full panoply of state power,
> petitioners would have been free to occupy the
> properties in question without restraint.
>
> "These are not cases, as has been suggested, in
> which the States have merely abstained from action,
> leaving private individuals free to impose such dis-
> criminations as they see fit. Rather, these are cases
> in which the States have made available to such indi-

---

[3] The Georgia trespass law is found in Ga. Code Ann., § 26–3005
(1963 Supp.), and that of Alabama in Ala. Code, Tit. 14, § 426 (1958
Recomp.).

viduals the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell. The difference between judicial enforcement and nonenforcement of the restrictive covenants is the difference to petitioners between being denied rights of property available to other members of the community and being accorded full enjoyment of those rights on an equal footing."

Section 202 declares the right of all persons to be free from certain kinds of state action at *any* public establishment—not just at the previously enumerated places of public accommodation:

"All persons shall be entitled to be free, at any establishment or place, from discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule, or order of a State or any agency or political subdivision thereof."

Thus the essence of many of the guarantees embodied in the Act are those contained in the Fourteenth Amendment.

The Commerce Clause, to be sure, enters into some of the definitions of "place of public accommodation" in §§ 201 (b) and (c). Thus a "restaurant" is included, § 201 (b)(2), "if . . . it serves or offers to serve interstate travelers or a substantial portion of the food which it serves . . . has moved in commerce." § 201 (c)(2). But any "motel" is included "which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the pro-

prietor of such establishment as his residence." §§ 201 (b)(1) and (c)(1). Providing lodging "to transient guests" is not strictly Commerce Clause talk, for the phrase aptly describes any guest—local or interstate.

Thus some of the definitions of "place of public accommodation" in §201 (b) are in Commerce Clause language and some are not. Indeed § 201 (b) is explicitly bifurcated. An establishment "which serves the public is a place of public accommodation," says § 201 (b), under either of two conditions: *first,* "if its operations affect commerce," or *second,* "if discrimination or segregation by it is supported by State action."

The House Report emphasizes these dual bases on which the Act rests (H. R. Rep. No. 914, 88th Cong., 1st Sess., p. 20)—a situation which a minority recognized was being attempted and which it opposed. *Id.,* pp. 98–101.

The Senate Committee laid emphasis on the Commerce Clause. S. Rep. No. 872, 88th Cong., 2d Sess., pp. 12–13. The use of the Commerce Clause to surmount what was thought to be the obstacle of the *Civil Rights Cases,* 109 U. S. 3, is mentioned. *Ibid.* And the economic aspects of the problems of discrimination are heavily accented. *Id.,* p. 17 *et seq.* But it is clear that the objectives of the Fourteenth Amendment were by no means ignored. As stated in the Senate Report:

> "Does the owner of private property devoted to use as a public establishment enjoy a property right to refuse to deal with any member of the public because of that member's race, religion, or national origin? As noted previously, the English common law answered this question in the negative. It reasoned that one who employed his private property for purposes of commercial gain by offering goods or services to the public must stick to his bargain. It is to be remembered that the right of the private

property owner to serve or sell to whom he pleased was never claimed when laws were enacted prohibiting the private property owner from dealing with persons of a particular race. Nor were such laws ever struck down as an infringement upon this supposed right of the property owner.

"But there are stronger and more persuasive reasons for not allowing concepts of private property to defeat public accommodations legislation. The institution of private property exists for the purpose of enhancing the individual freedom and liberty of human beings. This institution assures that the individual need not be at the mercy of others, including government, in order to earn a livelihood and prosper from his individual efforts. Private property provides the individual with something of value that will serve him well in obtaining what he desires or requires in his daily life.

"Is this time honored means to freedom and liberty now to be twisted so as to defeat individual freedom and liberty? Certainly denial of a right to discriminate or segregate by race or religion would not weaken the attributes of private property that make it an effective means of obtaining individual freedom. In fact, in order to assure that the institution of private property serves the end of individual freedom and liberty it has been restricted in many instances. The most striking example of this is the abolition of slavery. Slaves were treated as items of private property, yet surely no man dedicated to the cause of individual freedom could contend that individual freedom and liberty suffered by emancipation of the slaves.

"There is not any question that ordinary zoning laws place far greater restrictions upon the rights of private property owners than would public accom-

modations legislation. Zoning laws tell the owner of private property to what type of business his property may be devoted, what structures he may erect upon that property, and even whether he may devote his private property to any business purpose whatsoever. Such laws and regulations restricting private property are necessary so that human beings may develop their communities in a reasonable and peaceful manner. Surely the presence of such restrictions does not detract from the role of private property in securing individual liberty and freedom.

"Nor can it be reasonably argued that racial or religious discrimination is a vital factor in the ability of private property to constitute an effective vehicle for assuring personal freedom. The pledge of this Nation is to secure freedom for every individual; that pledge will be furthered by elimination of such practices." *Id.*, pp. 22–23.

Thus while I agree with the Court that Congress, in fashioning the present Act used the Commerce Clause to regulate racial segregation, it also used (and properly so) some of its power under § 5 of the Fourteenth Amendment.

I repeat what I said earlier, that our decision should be based on the Fourteenth Amendment, thereby putting an end to all obstructionist strategies and allowing every person—whatever his race, creed, or color—to patronize all places of public accommodation without discrimination whether he travels interstate or intrastate.

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS, CONCURRING.

(1) *The Administration Bill* (as introduced in the House by Congressman Celler, it was H. R. 7152).

Unlike the Act as it finally became law, this bill (a) contained findings (pp. 10–13) which described discrimina-

tion in places of public accommodation and in findings (h) and (i) connected this discrimination to state action and invoked Fourteenth Amendment powers to deal with the problem; and (b) in setting forth the public establishments which were covered, it used only commerce-type language and did not contain anything like the present § 201 (d) and its link to § 201 (b)—the "or" clause in § 201 (b). Nor did the bill contain the present § 202.

In the hearings before the House Judiciary Subcommittee the Attorney General stated clearly and repeatedly that while the bill relied "primarily" on the Commerce Clause, it was also intended to rest on the Fourteenth Amendment. See Hearings before Subcommittee No. 5, House Judiciary Committee, 88th Cong., 1st Sess., 1375–1376, 1388, 1396, 1410, 1417–1419.

(2) *The Subcommittee Bill* (as reported to the full House Judiciary Committee).

The Attorney General testified against portions of this bill. He reiterated that the administration bill rested on the Fourteenth Amendment as well as on the Commerce Clause: see Hearings, House Judiciary Committee on H. R. 7152, as amended by Subcommittee No. 5, 88th Cong., 1st Sess., 2693, 2700, 2764. But this bill added for the first time a provision similar to the present § 201 (d)—only much broader. See *id.*, at 2656, first full paragraph. (Apparently this addition was in response to the urgings of those who wanted to broaden the bill and who failed to comprehend that the administration bill already rested, despite its commerce language, on the Fourteenth Amendment.) The Attorney General feared that the new provision went too far. Further, the new provision, unlike the present § 201 (d) but like the present § 202, did not limit coverage to those establishments specifically defined as places of public accommodation; rather it referred to all businesses operating under state

"authorization, permission, or license." See *id.*, at 2656. The Attorney General objected to this: Congress ought not to invoke the Fourteenth Amendment generally but rather ought to specify the establishments that would be covered. See *id.*, at 2656, 2675–2676, 2726. This the administration bill had done by covering only those establishments which had certain commercial characteristics.

Subsequently the Attorney General indicated that he would accept a portion of the Subcommittee additions that ultimately became §§ 201 (d) and 202; but he made it clear that he did not understand that these additions removed the Fourteenth Amendment foundation which the administration had placed under its bill. He did not understand that these additions confined the Fourteenth Amendment foundation of the bill to the additions alone; the commerce language sections were still supported in the alternative by the Fourteenth Amendment. See especially *id.*, at 2764; compare p. 2727 with p. 2698. The Subcommittee said that it made these additions in order to insure that the Fourteenth Amendment was relied on. See *id.*, at 2763; also Subcommittee Hearings, *supra*, 1413–1421. And the Attorney General repeated at p. 2764 that he would agree to whatever language was necessary to make it clear that the bill relied on the Fourteenth Amendment as well as the Commerce Clause.

Therefore it seems clear that a dual motive was behind the addition of what ultimately became §§ 201 (d) and 202: (1) to expand the coverage of the Act; (2) to make it clear that Congress was invoking its powers under the Fourteenth Amendment.

(3) *The Committee Bill* (as reported to the House).

This bill contains the present §§ 201 (d) and 202, except that "state action" is given an even broader definition in § 201 (d) as then written than it has in the present § 201 (d).

The House Report has the following statement: "*Section 201 (d)* delineates the circumstances under which discrimination or segregation by an establishment is supported by State action within the meaning of title II." H. R. Rep. No. 914, 88th Cong., 1st Sess., 21. On p. 117 of the Report Representative Cramer says: "The 14th amendment approach to public accommodations [in the committee bill as contrasted with the administration bill] is not limited to the narrower definition of 'establishment' under the interstate commerce approach and covers broad State 'custom or usage' or where discrimination is 'fostered or encouraged' by State action (sec. 201 (d))." By implication the committee has merely broadened the coverage of the administration's bill by adding the explicit state action language; it has not thereby removed the Fourteenth Amendment foundation from the commerce language coverage.

Congressman Celler introduced into the Congressional Record a series of memoranda on the constitutionality of the various titles of the bill; at pp. 1524–1526* the Fourteenth Amendment is discussed; at p. 1526 it is suggested that the Thirteenth Amendment is to be regarded as "additional authority" for the legislation.

At p. 1917 Congressman Willis introduces an amendment to strike out "transient guests" and to replace these words with "interstate travelers." As reported, says Congressman Willis, the bill boldly undertakes to regulate intrastate commerce, at least to this extent. *Ibid.* The purpose of the amendment is simply to relate "this bill to the powers of Congress." *Ibid.* Congressman Celler, the floor manager of the bill, will not accept the amendment, which introduces an element of uncertainty into the scope of the bill's coverage. At p. 1924 Congressman

---

*All citations are to Vol. 110, Congressional Record.

Lindsay makes remarks indicating that it is his understanding that the commerce language portions of § 201 rest only on the Commerce Clause, while the Fourteenth Amendment is invoked to support only § 201 (d).

But at p. 1926 Congressman MacGregor, a member of the Judiciary Subcommittee, states, in response to Congressman Willis' challenge to the constitutionality of the "transient guests" coverage, that: "When the gentleman from Louisiana seeks in subparagraph (1) on page 43 [§ 201 (b)(1)] to tightly circumscribe the number of inns, hotels, and motels to be covered under this legislation he does violence to the 1883 Supreme Court decision where it defines the authority of the Congress under the 14th amendment. . . . Mr. Chairman, in light of the 1883 Supreme Court decision cited by the gentleman from Louisiana, and in light of a score of subsequent decisions, it is precisely the legislative authority granted in the 14th amendment that we seek here to exercise."

At pp. 1962–1968 there is the discussion surrounding the passage of the Goodell amendment striking the word "encouraged" from § 201 (d)(2) of the bill as reported. Likewise in these pages there is the discussion concerning the Willis amendment to the Goodell amendment: this amendment eliminated the word "fostered." After the adoption of these amendments the custom or usage had to be "required or enforced" by the State—not merely "fostered or encouraged" in order to constitute "state action" within the meaning of the Act.

At p. 1964 Congressman Smith of Virginia offered an amendment as a substitute to the Goodell amendment that would have eliminated the "custom or usage" language altogether. Congressman Celler said in defense of the bill as reported: "[C]ustom or usage is not constituted merely by a practice in a neighborhood or by popular attitude in a particular community. It consists of a practice which, though not embodied in law, receives notice and sanction to the extent that it is enforced by

the officialdom of the State or locality" (pp. 1964–1965). The Smith Amendment was rejected by the House (p. 1967).

It would seem that the action on this Smith substitute and the statement by Congressman Celler mean that a State's enforcement of the custom of segregation in places of public accommodation by the use of its trespass laws is a violation of § 201 (d)(2).

(4) *The House Bill.*

The House bill was placed directly on the Senate calendar and did not go to committee. The Dirksen-Mansfield substitute adopted by the Senate made only one change in §§ 201 and 202: it changed "a" to "the" in § 201 (d)(3). Senator Dirksen nowhere made any explicit references to the constitutional bases of Title II. Thus it is fair to assume that the Senate's understanding on this question was no different from the House's view. The Senate substitute was adopted without change by the House on July 2, 1964, and signed by the President on the same day.

MR. JUSTICE GOLDBERG, concurring.*

I join in the opinions and judgments of the Court, since I agree "that the action of the Congress in the adoption of the Act as applied here . . . is within the power granted it by the Commerce Clause of the Constitution, as interpreted by this Court for 140 years," *ante*, at 261.

The primary purpose of the Civil Rights Act of 1964, however, as the Court recognizes, and as I would underscore, is the vindication of human dignity and not mere economics. The Senate Commerce Committee made this quite clear:

"The primary purpose of . . . [the Civil Rights Act], then, is to solve this problem, the deprivation of personal dignity that surely accompanies denials

---

*[This opinion applies also to No. 543, *Katzenbach* v. *McClung*, *post*, p. 294.]

of equal access to public establishments. Discrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public because of his race or color. It is equally the inability to explain to a child that regardless of education, civility, courtesy, and morality he will be denied the right to enjoy equal treatment, even though he be a citizen of the United States and may well be called upon to lay down his life to assure this Nation continues." S. Rep. No. 872, 88th Cong., 2d Sess., 16.

Moreover, that this is the primary purpose of the Act is emphasized by the fact that while § 201 (c) speaks only in terms of establishments which "affect commerce," it is clear that Congress based this section not only on its power under the Commerce Clause but also on § 5 of the Fourteenth Amendment.[1] The cases cited in the Court's opinions are conclusive that Congress could exercise its

---

[1] Hearings in Congress as well as statements by administration spokesmen show that the original bill, presented by the administration, was so based even though it contained no clause which resembled § 201 (d)—the so-called "state action" provision—or which even mentioned "state action." See, e. g., Hearings before Senate Committee on Commerce on S. 1732, 88th Cong., 1st Sess., 23, 27–28, 57, 74, 230, 247–248, 250, 252–253, 256, 259; Hearings before Senate Judiciary Committee on S. 1731, 88th Cong., 1st Sess., 151, 152, 186; Hearings before Subcommittee No. 5 of the House Committee on the Judiciary on H. R. 7152, 88th Cong., 1st Sess., 1396, 1410; Hearings before House Judiciary Committee on H. R. 7152, as amended by Subcommittee No. 5, 88th Cong., 1st Sess., 2693, 2699–2700; S. Rep. No. 872, 88th Cong., 2d Sess., 2. The later additions of "state action" language to § 201 (a) and § 201 (d) did not remove the dual Commerce Clause-Fourteenth Amendment support from the rest of the bill, for those who added this clause did not intend thereby to bifurcate its constitutional basis. This language and § 201 (d) were added, first, in order to make certain that the Act would cover all or almost all of the situations as to which this Court might hold that § 1 of the Fourteenth Amendment applied. Senator Hart stated that not to do so would "embarrass Congress

powers under the Commerce Clause to accomplish this purpose. As §§ 201 (b) and (c) are undoubtedly a valid exercise of the Commerce Clause power for the reasons stated in the opinions of the Court, the Court considers that it is unnecessary to consider whether it is additionally supportable by Congress' exertion of its power under § 5 of the Fourteenth Amendment.

In my concurring opinion in *Bell* v. *Maryland,* 378 U. S. 226, 317, however, I expressed my conviction that § 1 of the Fourteenth Amendment guarantees to all Americans the constitutional right "to be treated as equal members of the community with respect to public accommodations," and that "Congress [has] authority under § 5 of the Fourteenth Amendment, or under the Commerce Clause, Art. I, § 8, to implement the rights protected by § 1 of the Fourteenth Amendment. In the give-and-take of the legislative process, Congress can fashion a law drawing the guidelines necessary and appropriate to facilitate practical administration and to distinguish between genuinely public and private accommodations." The challenged Act is just such a law and, in my view, Congress clearly had authority under both § 5 of the Fourteenth Amendment and the Commerce Clause to enact the Civil Rights Act of 1964.

---

because . . . the reach of the administration bill would be less inclusive than that Court-established right." Hearings before Senate Commerce Committee, *supra,* at 256. See also *id.,* at 259–262. Second, the sponsors of § 201 (d) were trying to make even clearer the Fourteenth Amendment basis of Title II. See, *e. g.,* Hearings before Subcommittee No. 5 of the House Committee, *supra,* at 1413–1418; Hearings before the Senate Commerce Committee, *supra,* at 259–262. There is no indication that they thought the inclusion of § 201 (d) would remove the Fourteenth Amendment foundation of the rest of the title. Third, the history of the bill after provisions similar to § 201 (d) were added contains references to the dual foundation of all Title II provisions before us. See Hearings before Subcommittee No. 5 of the House Committee, *supra,* at 1396, 1410; Hearings before House Judiciary Committee, *supra,* at 2693, 2699–2700; 110 Cong. Rec. 1925–1928.